No. 47,080

ELLA MESECHER and RICHARD L. MESECHER, *Appellants,* v. LEE
CROPP, an Individual, and ELMER F. FOX, et al., *Appellees.*

(518 P. 2d 504)

696

Opinion filed January 26, 1974.

*Jack P. Steinle,* of Aurora, Missouri, argued the cause, and *John C. Woelk,* of Woelk and Culley, of Russell, was with him on the brief for the appellants.

*Edwin P. Carpenter,* of Topeka, argued the cause, and *Lee Turner* and *Raymond L. Dahlberg,* of Turner, Chartered, of Great Bend, were on the brief for the appellees.

The opinion of the court was delivered by

FOTH, C.: This is an automobile collision case in which the jury rendered a verdict for the defendants and the plaintiffs have appealed. The primary plaintiff is Ella Mesecher, who sued for her personal injuries; her husband Richard joined as plaintiff on his claims for loss of consortium and for medical expenses. The primary defendant is Lee Cropp; his partners in the accounting firm of Elmer Fox and Company were joined as defendants because he was on firm business at the time he was involved in the collision.

The collision occurred about 4:45 p. m. on December 18, 1968, on U. S. Highway 281 about 14 miles north of Russell, Kansas. The plaintiff Mrs. Mesecher was a passenger in a 1963 Ford being driven by her friend Florence Bates. She was going from her home in Lucas to Russell, where she was employed as a nurse at the city hospital. A heavy snow was falling as the Bates car turned south onto U. S. 281, and Mrs. Bates drove at 20 to 25 miles per hour. After about two miles the car developed engine trouble and stalled. Mrs. Bates brought the car to a stop in the southbound (west) lane, near the right shoulder.

It was still daylight, and there was no other traffic in sight. To the north, whence they had come, there was a long, straight, gentle rise in grade to a crest some half a mile away. Mrs. Bates got out of the car on the driver's side, either to check the car or push it; plaintiff started to slide over under the wheel when Mrs. Bates saw the defendant's car approaching from the rear and called out, "Ella, he is going to hit us."

Defendant was also headed south toward Russell in his Volkswagen. He had previously slowed to as little as five to ten miles per hour on account of the snow, but as he got nearer to Russell his speed picked up until he was running at about 35 miles per hour. When he saw the Bates car it was too late for him to stop, and rather than risk turning into the other lane or onto the shoulder

he chose to slide into the Bates car. He was going, by his estimate, ten to fifteen miles per hour when he struck the rear of the Bates car. A pickup truck came along a few minutes later, also from the north, and stopped behind the defendant's Volkswagen without incident.

Mrs. Mesecher, who was still in the Bates car when it was hit, sustained spinal injuries. Although the extent of those injuries was hotly disputed, she ultimately underwent a fusion of three cervical vertabrae.

After judgment was entered on the defendants' verdict of March 26, 1971, plaintiffs filed a motion for a new trial and an amended motion. At the time set for hearing, before plaintiffs presented argument, the trial court expressed its own concern over whether plaintiffs had had a fair trial. Specifically, the court insisted that its consideration of whether to grant a new trial should encompass the questions of (1) erroneous instructions, (2) misconduct of defendants' counsel, and (3) misconduct of the defendant himself. Plaintiffs' motions alleged various trial errors in addition to those raised by the court, and including the first two. After the issues were thus defined, the hearing was continued for the parties to gather evidence and prepare briefs.

At the adojurned hearing the trial court ruled generally, and in some cases specifically, against the plaintiffs on all issues raised by their motions and by the court on its own motion, and denied a new trial. The court was obviously reluctant to make such a ruling saying:

"Overall, I suppose it is a fair statement that what most worries the court about this case, what he is most concerned with, is the simple fact that if the court had been the trier of fact, he would have reached a different conclusion than the jury did."

Nevertheless, the trial court properly felt that he could not substitute his judgment of the facts for that of the jury.

As to the allegations of trial error, we think it a fair summary to say that the trial judge was acutely conscious of his role as arbiter and not advocate. This consciousness led him to "bend over backwards" not to interject himself into the trial, but to give counsel as free a hand as possible. We shall note his comments on the problems this led to as we discuss what we consider the key issues in this appeal.

This court, after a careful review of the record, has concluded that the plaintiffs were deprived of a fair trial by the cumulative

effect of at least three trial errors and one erroneous instruction. While it is possible to argue (and defendants do) that none of these might be reversible standing alone, the court is convinced that under the facts of this case the overall effect of these errors must have been prejudicial. Cf. *Walker v. Holiday Lanes*, 196 Kan. 513, 413 P. 2d 63; *Carpenter v. Gillard*, 166 Kan. 689, 204 P. 2d 595, Syl. ¶ 8; *Brack v. Kleweno*, 169 Kan. 569, 220 P. 2d 125, Syl. ¶ 2.

The first two, which represent two aspects of the same problem, concern the use of the depositions of the primary parties. At the close of plaintiffs' case, after all their testimony was in, their counsel offered into evidence the deposition of the defendant Cropp for the purpose of showing his admissions against interest. Counsel proposed to read to the jury those portions regarded by him as damaging to the defendant, including those relating to the absence of traffic, the location of the defendant when the Bates car was observed, the lookout by the defendant, the position of Mrs. Bates when he first observed her, the speed of the defendant, the unobstructed condition of the roadway, the weather and light conditions and the width of the roadway and shoulders.

Defense counsel objected and the court sustained the objection, commenting:

"If you want to call Mr. Cropp as a witness, you, of course, could do so. If you want to propose stipulations, you can do so. I don't know why we have to go to a deposition."

The applicable statute was K. S. A. 60-226 (*d*) (now K. S. A. 1973 Supp. 60-232 [*a*]):

"(*d*) *Use of depositions*. At the trial . . . any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition or who had due notice thereof, in accordance with any one of the following provisions:

. . . . . . . . . . . . .

"(2) The deposition of a party . . . may be used by an adverse party for any purpose. . . .

. . . . . . . . . . . . .

"(4) If only part of a deposition is offered in evidence by a party, an adverse party may require him to introduce all of it which is relevant to the part introduced, and any party may introduce any other parts."

In *Aspelin v. Mounkes*, 206 Kan. 132, 476 P. 2d 620, we held:

"A deposition of a party containing an admission against interest is admissible, regardless of whether the party is present at the trial or absent from the jurisdiction." (Syl. ¶ 3.)

In the course of that opinion it was said:

". . . In *Taylor v. Maxwell,* 197 Kan. 509, 419 P. 2d 822, we pointed out that K. S. A. 60-226 (*d*) (2) specifically authorizes the use by an adverse party, for any purpose, of a deposition of a *party,* without regard to the limitations applicable generally to the deposition of witnesses offered by either party." (p. 138.)

Under these authorities and under the statute it was clearly erroneous to prevent plaintiffs from making the proposed use of defendant's deposition; they were entitled to use it "for any purpose." They chose to use the deposition in a manner presumably calculated to have the greatest impact on the jury, *i. e.,* at the close of their case; this they were entitled to do. They were not required to call Mr. Cropp as their witness as suggested by the trial court, in order to put his admissions into evidence.

The latter suggestion brings up the other side of the deposition coin, which was the defendants' use of Mrs. Mesecher's deposition. In that deposition she described her symptoms, including a numbness or tingling in her left arm. At trial, on cross-examination, defense counsel attempted to have her characterize those symptoms as "glove-type anesthesia," a condition which he was prepared to show was the result of either malingering or conversion hysteria. She declined to adopt that phrase, saying, "Mr. Turner, those are your words. I tried to tell you where I hurt and how I hurt, but those were your words, Mr. Turner."

At that point counsel set out to impeach her by reading questions and answers from her deposition. Plaintiffs' counsel soon objected, but was overruled. There followed a reading of questions and answers from the deposition, consuming six pages in the record, without any pretense of a question to the witness on the stand, until finally the trial court intervened:

"THE COURT: Mr. Turner, I am about to stop your examination of this witness on her deposition. As I would understand it, the proper province is to examine her on testimony given here today, and you are basically limited to that. You can go into her deposition if there is a conflict between her testimony and her deposition, but we are just going on and on here in areas where it appears to me the deposition is completely consistent with the essence of the testimony given today."

The trial court obviously thought at this point that such use of a deposition in a purported cross-examination was improper, and we agree.

Counsel is entitled to impeach any witness by showing prior inconsistent statements, and where they are contained in a deposition he may cross-examine the witness about the deposition. Addition-

ally, as pointed out in the discussion above, he is also entitled to use the deposition of a party as substantive evidence, by reading into evidence the admissions contained therein as part of his case-in-chief. Here the court found no inconsistent statements in Mrs. Mesecher's deposition; hence the proper method of using the deposition was for the defendants to introduce it during *their* case-in-chief. The course actually employed undoubtedly gave the impression to the jury that, at least in counsel's view, the witness was lying. Where successful, and where the witness is a party, such tactics can be devastating.

In the post-trial proceedings it was this tactic which the trial judge raised on his own motion as possibly constituting "misconduct of counsel." In so doing he characterized the proceeding in the light of his own first-hand observation of the trial:

"It is the court's recollection, was at the time, and still is, that there was really nothing in the deposition that was inconsistent with the testimony that was given from the witness stand, and that this method of proceeding, as it turns out, was an *oppressive, unnecessarily hostile way of cross-examining the woman plaintiff.*

"*I am concerned about the inference the jury may have gotten from this method of proceeding.* I am somewhat concerned about what effect it may have had on the appearance of the woman plaintiff in the eyes of the jury. I am concerned about what effect it may have had on the woman presenting her testimony in a normal, natural way.

"Now, in this regard, I have attempted to discourage Mr. Turner from proceeding in cross-examining any hostile witness in this manner in other instances. I have not been successful in so doing. *I don't think it is a fair way to proceed* unless there really is something in the testimony given from the witness stand that is truly different than given in the deposition. And to, in effect, and in fact, *wave the deposition in front of the witness in what really was a threatening way,* isn't the way I would like counsel to proceed. The question in this case would be, did this tactic constitute misconduct of counsel?" (Emphasis added.)

At that stage the trial court obviously thought that counsel's tactics were not only improper but prejudicial. Yet when it came time to rule on the motion for a new trial the court said:

"Relative to the use of the deposition by the defendant's counsel, the court has already said he is dissatisfied with the way defendant's counsel used the deposition in this case, and has in other cases. The court is still dissatisfied, very dissatisfied, but this is a very difficult area. Counsel on the other side, if they make an objection, and as far as the objection is concerned at that time it appears to the court that it is not well taken; then if defendant's counsel continues, maybe plaintiffs' counsel object again, and it appears to the court the objection is not well taken; and plaintiffs' counsel don't want to be jumping up and down all the time because of the disadvantage they feel that

places them in p[s]ychologically with the jury. I can see their problem. Then they don't object, and then the court faces the situation, 'Does he get involved by in effect making his own objection?' As I say, you don't want to. Anything you do—anything a court does in this area is wrong. That is just what it amounts to. Either way the court goes, he is wrong.

"I don't know what to do about it relative to the future. I don't want it to continue. Somehow I am going to try to see that it doesn't. As much as I disapprove of that, I have to consider it as against my proper position overall in ruling upon this motion for a new trial."

The court overruled the motion—the trial judge once again submerging his own view of propriety and fairness to his concept of his role as referee. While not wishing to second guess him on rulings made in the midst of the fray, in this instance we think he was unduly reticent. An objection had been made, and though his initial ruling may have been correct it soon became apparent that the objection was good. He could and should have moved sooner, and his failure to do so contributed to the overall unfairness we perceive in this trial. Having recognized this at the time he ruled on the motion for new trial, he should have rectified the error by granting the motion.

Yet a third element of unfairness entered the case when defendants were permitted to place the findings of their examining physician before the jury without ever subjecting him to cross-examination. That piece of evidentiary legerdemain came about in this fashion: Mrs. Mesecher was examined by defendant's expert, Dr. Schweinfurth, a neurosurgeon. The doctor was not subpoenaed, and at the time of trial was in California attending a convention. Prior to trial, at the direction of defense counsel, a copy of Dr. Schweinfurth's report was sent unsolicited to Mrs. Mesecher's treating physician, Dr. Starkey. After Dr. Starkey, a general practitioner, testified as to his diagnosis, treatment and prognosis, on cross-examination defense counsel secured from him his file. Lo and behold, he found therein the report of Dr. Schweinfurth. Dr. Starkey admitted knowing Dr. Schweinfurth and conceded his good reputation as a neurosurgeon. He was then asked:

"Q You will note he examined this woman to find out after the surgery if there were any objective findings neurologically to support her subjective complaints, and found absolutely none?"

A hearsay objection was overruled. Over repeated similar objections counsel was able to place in evidence each of the significant findings made by the absent Dr. Schweinfurth.

Defendants seek to justify this use of the Schweinfurth report

under K. S. A. 60-456 (*b*) (1), which permits an expert to give an opinion "based on facts or data perceived by or personally known or made known to the witness at the hearing." There are two difficulties with this position. First, Dr. Starkey did not claim to base his opinion on the facts or data in the Schweinfurth report; and second, those facts or data were not "perceived by or personally known" to him, nor were they "made known" to him at the hearing in any acceptable way. We said in *Casey v. Phillips Pipeline Co.,* 199 Kan. 538, 431 P. 2d 518, Syl. ¶ 1:

"K. S. A. 60-456 requires that an expert witness base his testimony upon facts personally perceived by or known to him or made known to him at the hearing. 'Perceived' means knowledge acquired through one's own senses (K. S. A. 60-459 [*c*], and 'made known' refers to facts *put in evidence."* (Emphasis added.)

Even hypothetical questions must be based on facts in evidence. *Trimble, Administrator v. Coleman Co., Inc.,* 200 Kan. 350, 437 P. 2d 219.

Here Dr. Schweinfurth's report was pure hearsay. Cf. *Kreh v. Trinkle,* 185 Kan. 329, 343, 343 P. 2d 213; *Love v. Common School District,* 192 Kan. 780, 391 P. 2d 152. Had his testimony as to his examination and findings been in evidence his report embodying them would have been a proper tool for cross-examination. As it was, the procedure employed can only be described as "boot-legging" into evidence data otherwise inadmissible.

Finally, we have the question of the erroneously given instruction. The trial court gave virtually all the rules for determining liability in one lengthy instruction covering the claims of the parties, burden of proof, statutory rules of the road, and of particular significance, "emergency." Plaintiffs made only a general objection to the entire instruction, and so are precluded from claiming reversible error unless the instruction was "clearly erroneous." K. S. A. 60-251 (*b*); *Thompson v. General Finance Co., Inc.,* 205 Kan. 76, 468 P. 2d 269; *Bott v. Wendler,* 203 Kan. 212, 453 P. 2d 100.

The question is a close one. The "emergency" instruction cannot be said to be erroneous as an abstract proposition of law, being based on PIK 8.81. We have, however, recently questioned the practice of giving such an instruction at all. In *Lawrence v. Deemy,* 204 Kan. 299, 461 P. 2d 770, we stated:

"The doctrine of sudden emergency cannot be regarded as something apart from and unrelated to the fundamental rule that everyone is under a duty to

exercise ordinary care under the circumstances to avoid injury to others. A claim of emergency is but a denial of negligence. Application of the doctrine is really application of the test for negligence couched in language tailored to a peculiar situation. The fact that a person is confronted with a sudden emergency not caused by his own tortious conduct which requires rapid decision is merely a factor in determining the reasonable character of his choice of action and whether his conduct constituted negligence. (Restatement of Torts § 296.)" (p. 303.)

In *Kline v. Emmele,* 204 Kan. 629, 465 P. 2d 970, we quoted with approval the foregoing language, and approved a trial court's refusal to give an "emergency" instruction. In so doing we commented:

"We are impressed with the suggestion that where there is definite evidence of negligence on the part of the defendant, the weight of such evidence might be entirely destroyed by an instruction on sudden emergency. Such an instruction might well cause the jury to lose sight of the negligence which caused the emergency." (p. 632.)

Here there seems little, if any, justification for giving such an instruction under even the most liberal view of defendants' theory of the case. The trial court observed:

"Complaint is made as to giving of the emergency instruction. It is true, as plaintiff argues, the defendant knew for quite a period of time that the weather was bad, and that he should be driving carefully, and as I would see it, it was not an emergency situation. As I would see it, his conduct was negligent. As I would see it, his conduct was causative. As I would see it, he caused the collision."

We think the trial court put its finger squarely on the fallacy of giving the emergency instruction here. The lack of any "emergency" is demonstrated by, if nothing else, the routine stop of the pickup truck shortly after the collision. The conclusion is inescapable that a proper lookout on defendant's part would have prevented any "emergency" from arising.

The trial court deferred to the judgment of the jury; yet that judgement was tainted by an instruction which the trial court felt was unwarranted by the evidence. Whether the giving of the emergency instruction was "clearly" erroneous we need not determine. Its likely prejudicial effect was noted in *Kline,* supra. As previously indicated, we find sufficient error permeating the trial, including this one, to convince the court that the result cannot stand. The judgment is therefore reversed and the case is remanded with directions to grant a new trial.

APPROVED BY THE COURT.