(930 P.2d 609)
No. 75,575

IN THE MATTER OF THE ADOPTION OF N.A.P.

Opinion filed December 20, 1996.

*Karen E. Rocha, Karen L. Schneider,* and *Sanford P. Krigel,* of Krigel & Krigel, P.C., of Kansas City, Missouri, for appellant.

*Joseph N. Vader,* of Joseph N. Vader, P.A., of Olathe, for appellees.

Before ELLIOTT, P.J., KNUDSON, J., and RICHARD M. SMITH, District Judge, assigned.

KNUDSON, J.: K.P., the birth mother of N.A.P., appeals the district court's denial of her motion to withdraw consent to adoption. K.P. raises three issues: (1) Did the district court err in its interpretation of K.S.A. 59-2115 and determination that K.P. was provided independent legal counsel? (2) Did the district court err in concluding that consent to the adoption was freely and voluntarily

given as required under K.S.A. 59-2114? (3) Did the district court err in its evidentiary ruling excluding certain evidence?

K.P. was a 17-year-old high school student when she gave birth to N.A.P. on April 3, 1995. Shortly after N.A.P.'s birth, K.P. and her mother were referred to attorney Susan Ellmaker to discuss the possibility of adoption. Ellmaker referred them to one of her associates, attorney Michelle Groth. All of the parties are in general agreement that during the first meeting Groth outlined adoption proceedings under Kansas law and discussed telling A.F., the birth father, of N.A.P.'s birth. Groth knew that K.P. and A.F were 17 years old. This first meeting concluded with K.P. needing to decide whether she wanted to consider the adoption of N.A.P.

Over the weekend, K.P.'s mother contacted K.P.'s aunt in Oklahoma. K.P.'s aunt knew of a couple interested in pursuing an adoption. K.P.'s mother misrepresented to the aunt that one of K.P.'s friends had given birth to a baby and was considering adoption. It is not altogether clear from the record on appeal, but K.P.'s aunt contacted B.H. and D.H. (hereafter called the adopting parents), and they, in turn, initiated contact with Groth through their Oklahoma attorney, Phyllis Zimmerman. Groth told Zimmerman that if K.P. decided to have her baby adopted, it would be a Kansas adoption, with Groth representing all of the parties. Groth explained to Zimmerman that dual representation is permitted in adoption proceedings, provided there is no conflict of interest between the parties.

The following Monday, K.P. decided to proceed with the adoption of N.A.P. Groth provided K.P. with resumes and biographical sketches of couples interested in adoption, which she began to review. On that same day, the adopting parents sent their biographical information to Groth's office; K.P. was given their biographical sketch as well.

On Tuesday, K.P. and her mother talked by telephone with the adopting parents. At that time, K.P. told them that she was serious about their adoption of N.A.P. Thus encouraged, the adopting parents agreed to come to Kansas the next day and meet with K.P. and her family.

On Wednesday, the parties met at the home of K.P.'s mother, and a decision was made to proceed with the adoption. The adopting parents made an appointment to meet with Groth the next morning. K.P.'s previously scheduled appointment with Groth was not supposed to be until Friday; however, because of the agreement for adoption, K.P. decided to reschedule her appointment so that the parties could all meet with Groth the next morning. K.P.'s expectations for the meeting were that the parties would place of record their agreement regarding future contacts between K.P. and N.A.P. after the adoption was final and that she and A.F. would execute the required consents to adoption. Unbeknownst to K.P., the adopting parents' meeting was rescheduled by Groth's office for the following afternoon. Why their meeting was rescheduled is not clear from the record.

The next morning, less than an hour before the scheduled meeting, Groth realized that under Kansas law, K.P. and A.F. were to be provided independent legal counsel. Groth informed Ellmaker, who then asked another attorney, Doug Wood, whose office was in the same suite as Ellmaker's, to meet with the birth parents and give them independent legal advice regarding the consequences of consent and have them execute the consent forms prepared by Groth's office. Either Ellmaker or Groth met with Wood for 5 minutes and gave him a cursory review of K.P.'s situation. In a subsequent meeting with K.P. and A.F., Wood (1) elucidated the nature of the free and voluntary consent; (2) inquired as to whether they were signing the consent because of undue influence or coercion; and (3) explained that after they signed the consent, it would be irrevocable, except under limited circumstances which Wood spelled out. Unfortunately, there was a problem with Wood's tape recorder, and the actual conversation prior to execution of the consents was not recorded. After discovering the problem, Wood had the presence of mind to immediately record the following discussion with the birth parents:

"[WOOD]: It is now about ten minutes to eleven, 10:50, on April 13, 1995, and we are here with [K.P.] and [A.F.].

"And we have shortly—a short time ago completed the signing of a consent to adoption of minor child form, and affidavits in reference to American Indian

ancestry, as well as—by each of the two parents, [A.F.] and [K.P.], as well as [K.P.] signing a residency affidavit and an affidavit regarding the identity of the putative father. Each of them also signed their portion of the completed—completed and signed their portion of the genetic parent information form for the Interstate Compact, and have also signed the medical authorization form to obtain medical records on [N.A.P.] from Shawnee Mission Medical Center.

"[K.P.], since we didn't get the proceedings on tape, I'm going to ask some questions regarding your consent.

"First of all, [K.P.], you understand that you're consulting me as your independent attorney to receive advice and counsel?

"**[K.P.]**: Yes.

"**[WOOD]**: And despite the fact that your fee or expenses for my services will be paid by the adoptive couple or their attorney, that I represent you and not them?

"**[K.P.]**: Yes.

"**[WOOD]**: Okay. And that I have advised prior to the signing of your consent form that the consent form is a document that needs to be signed freely and voluntarily; and that once it is so signed, that the consent to place the child for adoption is irrevocable?

"**[K.P.]**: Yes.

"**[WOOD]**: And have you signed that consent form freely and voluntarily?

"**[K.P.]**: Yes.

"**[WOOD]**: And you signed it without anyone putting any undue influence or coercing you, or—to sign it, or as a result of any fraud or mistake on your part?

"**[K.P.]**: Yes.

"**[WOOD]**: And you also signed the other affidavits that I made reference to; correct?

"**[K.P.]**: Yes.

"**[WOOD]**: And that your consent for the adoption is a conditional consent, conditional in the fact that you want the adoptive couple that you've designated to adopt this child and nobody else; correct?

"**[K.P.]**: Correct.

"**[WOOD]**: That if for some reason that adoption does not go through, you are to be consulted and have the child returned to you or to—for you to make [a] future independent decision regarding the child's best interests?

"**[K.P.]**: Yes.

. . . .

"**[WOOD]**: And I have it that you were born [in 1978]?

"**[K.P.]**: Yes.

"**[WOOD]**: Okay. And that although you have some American Indian heritage, that neither you nor any of your ancestors, to the best of your knowledge, ever were registered with an American Indian tribe, nor lived on any American Indian reservation; correct?

"**[K.P.]**: Correct.

"[**WOOD**]: Okay. [A.F.], likewise, you signed your consent form. Did you do so freely and voluntarily?

"[**A.F.**]: Yes.

"[**WOOD**]: And did you do so without anybody coercing you or putting any undue influence on you to sign it?

"[**A.F.**]: That's correct.

"[**WOOD**]: And that you understood that this was a consent to the adoption of [N.A.P.], and for no other reason. Nobody told you that this was not irrevocable. You understand that once you sign a consent, that it's irrevocable except for the circumstances of undue influence, or duress, or fraud, or mistake, outside of the fact that your consent is conditional upon this adoption—this specific adoption going through; correct?

"[**A.F.**]: Correct.

"[**WOOD**]: And that you understand that you have some American Indian ancestry, but no one in your family to your knowledge has ever been registered with an American Indian tribe, nor lived on any American Indian reservation; correct?

"[**A.F.**]: Correct.

"[**WOOD**]: And I think that's all we need to discuss.

"Other than, [K.P.], I did mention to you on the Interstate Compact form you signed as the responsible party; and that as such that you would be notified if the Interstate Compact authorities were to notify you that the placement with this adoptive couple in Oklahoma did not go through; and you would be given the opportunity—in fact, have the responsibility of retrieving the child?

"[**K.P.**]: Yes.

"[**WOOD**]: Okay. I also advised you that some time between now, and I'd say, at the latest, April 28th, you should receive notice from our court here in Johnson County as to the exact date and place of the adoption hearing, and that your attendance to that hearing is not mandatory. If you intend to attend, I would like you to notify me so I can notify the other attorney. Those proceedings are closed, unless you're invited to participate in the hearing itself.

"The notice to you would be not only as a courtesy so that you would know when the adoption is finalized but also the date by which you file any defenses or advise the Court of any circumstances that you think the Court ought to be aware of regarding the adoption. Okay?

"[**K.P.**]: Okay.

"[**WOOD**]: And that notification would be—should be in writing in the form of pleading or notice, written notice of some sort. That's pretty much it.

"Is [*sic*] there any questions you had that we had on the tape before that didn't get recorded?

"[**K.P.**]: No."

We note that K.P. had previously discussed with Groth her wish to have continued contact with N.A.P. after the adoption was final,

but the matter was not mentioned to Wood. However, we do know that in prior discussions with Groth, K.P. and her mother were informed and understood that K.P.'s desire to have future contacts with N.A.P. would not be legally binding.

There never was a meeting between the adopting parents and K.P. to prepare a social plan for future visits, pictures, and correspondence. Groth continued to represent the adopting parents. On April 14, 1995, the petition for adoption and temporary custody was filed, and the adopting parents took custody of N.A.P. On May 16, 1995, K.P. went to Oklahoma to discuss with the adopting mother future visitation with N.A.P. The adopting mother told K.P. that when N.A.P. was old enough and had questions about K.P., they would contact her and set up a meeting. Since the adopting parents' decision regarding K.P.'s future contact with N.A.P. was contrary to her expectations, K.P. told the adopting mother that she would like to have N.A.P. returned to her.

The hearing on the adoption petition was scheduled for May 22, 1995. When K.P. returned from Oklahoma, she contacted Groth's office and was referred to Wood. Although the record is not entirely clear, it is apparent during this time frame that the adopting parents were concerned about K.P.'s change of position and were in communication with Groth. On the morning of May 19, 1995, K.P. received a proposed social plan, which was signed by the adopting parents. The plan was not acceptable to K.P. Later that day, she met with Wood and informed him that she wished to withdraw her consent to the adoption. Knowing that he would undoubtedly be a witness in any hearing to consider the issue and believing that her adoption consent was freely and voluntarily given, Wood advised K.P. that he would not represent her. Wood did assist K.P. in preparing a motion for continuance of hearing to afford her an opportunity to obtain counsel. On May 22, 1996, the district court granted the continuance, and K.P. retained her present counsel.

The district court's hearing lasted 5 days, which extended over a 2-month period, on K.P.'s petition to withdraw her consent to the adoption. At the conclusion of the hearing, the district court found that K.P. had been provided independent legal advice and

that she had freely and voluntarily given her consent to the adoption of N.A.P. The court denied her petition and subsequently finalized the adoption.

### Was Independent Legal Counsel Provided?

The first issue raised on appeal requires our review of K.S.A. 59-2115 to determine the scope of legal representation that is afforded a minor parent giving consent to an adoption. Prior to enactment of the 1990 Kansas Adoption and Relinquishment Act (K.S.A. 59-2111 *et seq.*), we note that the minority of a parent did not invalidate the parent's consent to an adoption (K.S.A. 1989 Supp. 59-2102[d]) and that there was no legal requirement that the minor be provided independent legal counsel.

K.S.A. 59-2115 states:

"Minority of a parent shall not invalidate a parent's consent or relinquishment, except that a minor parent shall have the advice of independent legal counsel as to the consequences of the consent or relinquishment prior to its execution. The attorney providing independent legal advice to the minor parent shall be present at the execution of the consent or relinquishment. Unless the minor parent is otherwise represented by independent legal counsel, the petitioner or child placing agency shall provide independent legal counsel to the minor parent at such petitioner's or child placing agency's sole expense."

In construing K.S.A. 59-2115, the district court reasoned that independent counsel was only required for a limited purpose—the natural mother was to be provided independent legal counsel to explain the legal consequences of signing the consent document and to be present when the document was signed. The statute does not require that the parent be provided an attorney for representation throughout the proceedings.

We note that interpretation of a statute is a question of law, and our standard of review is de novo. *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, Syl. ¶ 1, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995).

We are also mindful that "a fundamental rule of statutory construction, to which all other rules are subordinate, is that the intent of the legislature governs if that intent can be ascertained." *City*

*of Wichita v. 200 South Broadway*, 253 Kan. 434, 436, 855 P.2d 956 (1993).

We believe that the district court's interpretation of K.S.A. 59-2115 is consistent with legislative intent. The statute on its face only requires independent legal counsel immediately prior to and at the time consent is executed. The legislature intended that the minor birth parent be afforded legal counsel to advise as to the consequences of executing a consent to adoption. It was not intended that the minor be provided legal representation for the adoption proceeding to follow. If the legislature would have intended full-blown legal representation for a minor, it would have said so.

The legislative history of the Kansas Adoption and Relinquishment Act also supports our reading of the statute. This legislative act originated from a study of the Family Law Advisory Committee of the Kansas Judicial Council. In its comments to K.S.A. 59-2115, the committee stated:

"Minors are afforded legal protection in regard to other decisions and it appears to the committee that the decision to give up a child merits attempts at protection as well. The proposed subsection would require independent legal counsel for a minor and the presence of the minor's attorney at the time the instrument is executed.

"Questions naturally arise as to the means for providing and paying for such independent counsel. The committee considered the possibility of having independent counsel appointed by the court. However, at the time independent counsel is needed the matter will not be pending before the court. . . . While there are concerns with the appearance of the petitioners or agency providing the independent counsel, there is also an incentive for such persons to insure a valid instrument is obtained and, consequently, to provide minors with attorneys who are truly independent of the petitioner or agency.

"The proposal requires the minor's attorney to be present at the time of execution in light of the fact that advice provided at an earlier time may diminish in value due to the intervening passage of time and birth of the child." (Comment #5 to S.B. 431 [1990].)

The report of the legislature's interim committee, the Special Committee on Judiciary, added the following comment regarding K.S.A. 59-2115:

"There would be a mandatory duty to advise, by independent legal counsel, parents who are under the age of majority, as to the consequences of the consent

or relinquishment. The attorney is further required to be present at the execution of the consent or relinquishment."

The comments of the Family Law Advisory Committee of the Kansas Judicial Council and of the Special Committee on Judiciary indicate K.S.A. 59-2115 was intended to provide a minor parent with the benefit of independent legal advice before executing a consent to adoption, not to represent the minor parent throughout the subsequent adoption proceeding.

K.P. also argues that she was, in fact, not provided independent legal counsel as required under K.S.A. 59-2115. This court's standard of review is whether there is substantial competent evidence to support the district court's determination that K.P. was provided independent counsel. "Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved." *Williams Telecommunications Co. v. Gragg*, 242 Kan. 675, 676, 750 P.2d 398 (1988).

Wood testified at the trial that he was not associated in practice with Ellmaker's office and that he presented himself to K.P. and A.F. as an attorney available to provide them with independent legal advice regarding the legal implications and consequences of executing a consent to N.A.P.'s adoption. Wood clearly explained to K.P. and A.F. that they were free to choose another lawyer. Woods' testimony was, in part, corroborated by Groth. Additionally, the transcript of the tape recording, which was previously set out in this opinion, discloses that Wood questioned K.P. on her willingness to sign the consent and that she was aware of the legal ramifications of execution. Finally, we note that the learned trial judge heard extensive testimony on this issue and was able to observe each of the witnesses and assess their credibility. We conclude that there was substantial evidence in the record to support the district court's determination that K.P. and A.F. did receive independent legal advice within the meaning of K.S.A. 59-2115.

In making this determination, we express the same concerns and reservations regarding the ethical propriety of Ellmaker and Groth in undertaking dual representation of the adopting parents and the

birth parents. The holding in *In re Adoption of Irons*, 235 Kan. 540, Syl. ¶ 7, 684 P.2d 332 (1984), expressly authorizing multiple representation in an adoption proceeding, is obviously distinguishable from this case. We believe that K.S.A. 59-2115 precludes multiple representations when a birth parent is a minor. Thus, our decision should not be construed as condoning the conduct of counsel. We simply came to the same conclusion as did the district court judge; *i.e.*, while counsel's professional conduct may be questionable, it did not void the consent executed by K.P. Rather, the conduct of Ellmaker and Groth was another circumstance that the district court judge properly considered in deciding whether there was compliance with K.S.A. 59-2115 and in determining that K.P.'s consent was freely and voluntarily given.

## Was Consent Freely and Voluntarily Given?

On appeal, K.P. argues that her consent was not freely and voluntarily given. She contends that her consent was tainted by mistake and lack of understanding.

"To be free and voluntary, a consent must be to all the legal consequences of the adoption with an understanding of the meaning and effect thereof. (Citations omitted.) Whether a consent to adoption was freely and voluntarily given or was tainted by fraud, duress, undue influence, mistake or lack of understanding necessarily depends on the facts and circumstances of each case. As such, these issues are to be determined by the trier of fact who has the best opportunity to weigh the evidence and test the credibility of witnesses. . . . It is not the function of this court to weigh conflicting evidence or redetermine questions of fact and our only concern is with evidence which supports the trial court's findings and not with evidence which might have supported contrary findings. [Citations omitted.]" *In re Adoption of Chance*, 4 Kan. App. 2d 576, 583, 609 P.2d 232, *rev. denied* 228 Kan. 806 (1980).

On appeal, K.P. asserts that her consent to the adoption was not voluntary because she was in extreme denial of her pregnancy and, therefore, could not have contemplated the nature of her acts. It does not appear from the record on appeal that this issue was raised before the trial court. An issue not raised below cannot be raised on appeal. *Furthmyer v. Kansas Dept. of Revenue*, 256 Kan. 825, 827-28, 888 P.2d 832 (1995). Additionally, it is the responsibility of the appellant to present a record that permits meaningful review

of an issue raised on appeal. *Frevele v. McAloon*, 222 Kan. 295, 299, 564 P.2d 508 (1977).

Furthermore, we note that there was controverted evidence in the record as to K.P.'s state of mind. K.S.A. 59-2114 provides that the burden of proving that consent was not freely and voluntarily given rests with the consenting party. Inherent in the district court judge's conclusion that K.P.'s consent should not be set aside is a negative finding that she failed to sustain her burden of proof.

"Absent arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice the finding of the trial judge cannot be disturbed. An appellate court cannot nullify a trial judge's disbelief of evidence nor can it determine the persuasiveness of evidence which the trial judge may have believed." *Mohr v. State Bank of Stanley*, 244 Kan. 555, 568, 770 P.2d 466 (1989).

K.P. next asserts that her consent was not voluntary because she believed that the adopting parents had agreed to her future visitations with N.A.P. Before executing her consent, K.P. knew that a visitation agreement would not be enforceable. In addition, there was disputed evidence before the district court as to whether there was any agreement regarding visitation. The adopting parents testified that they agreed to visitation by K.P.'s mother when she came to visit K.P.'s aunt in Oklahoma. The reason they were going to permit that visitation is that K.P's mother had deceived K.P.'s aunt as to the identity of N.A.P.'s birth mother and a visit would permit K.P.'s mother to carry out the subterfuge. The adopting parents testified that there was no agreement regarding visitation by K.P. This was a factual issue resolved by the district court upon disputed evidence and is not subject to reconsideration upon appeal.

### The Evidentiary Ruling

K.P. argues that the district court erred in refusing to allow her attorney to read portions of the adopting parents' depositions into evidence. The adopting parents fail to address this issue.

K.P. is correct that the district court erred. K.S.A. 60-232(a)(2) states:

"(a) *Use of deposition.* At the trial . . . any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then

present and testifying, may be used against any party who was present . . . at the taking of the deposition . . . in accordance with any of the following provisions:

. . . .

(2) The deposition of a party . . . may be used by an adverse party for any purpose."

The Kansas Supreme Court clearly decided this issue in *Mesecher v. Cropp*, 213 Kan. 695, 518 P.2d 504 (1974). In *Mesecher*, at the close of plaintiff's case, the plaintiff offered into evidence the deposition of the defendant for the purpose of showing his admissions against interest. Counsel proposed to read to the jury those portions regarded by him as damaging to the defendant. The defendant objected, and the trial court sustained the objection. The Supreme Court held that the trial court erred:

"[I]t was clearly erroneous to prevent plaintiffs from making the proposed use of defendant's depositions; they were entitled to use it 'for any purpose.' They chose to use the deposition in a manner presumably calculated to have the greatest impact on the jury, *i.e.*, at the close of their case; this they were entitled to do." 213 Kan. at 699.

K.P.'s counsel attempted to have admitted several portions of the adopting parents' deposition testimony.

The first excerpt from the adopting father's deposition tended to establish that he wanted independent counsel. The district court found that the adopting parents wanted independent counsel.

The second excerpt tended to show that the adopting father knew that Groth's office was initially representing both parties. Groth testified that she was, in fact, representing both parties until K.P. met with Wood.

The third excerpt tended to show that Groth's office did not withdraw from representation of the adopting parents and that Groth tried to prepare a social plan so that the adoption would go forward. Again, Groth testified that this occurred.

The final excerpt from the adopting father's deposition tended to show that he may have known that he and his wife were to meet with K.P. on the morning of the same day that K.P. signed the consent. There was ample uncontested testimony in the record to allow the judge to believe that such a meeting was planned. In

addition, this particular portion of the deposition did not lead to a clear determination that the adopting father knew that such a meeting was planned.

K.P.'s attorney next attempted to admit three portions of the adopting mother's deposition testimony.

The first tended to show that Groth did not give the adopting parents the choice of using independent counsel. Again, the judge found that Groth had insisted upon being the attorney for the adopting parents, despite their wish for independent counsel.

The second excerpt tended to show that Ellmaker had mistakenly believed that her office was still representing K.P. after K.P. had met with Wood and signed the consent. Again, this testimony was presented by the testimony of the witnesses.

The final excerpt tended to show that the adopting parents' appointment was changed from the morning until the afternoon of the the same day that K.P. signed the consent. Again, this testimony was elicited from other sources, and the deposition testimony did not show that the adopting mother knew that she and her husband were to meet with K.P.

None of the excluded deposition testimony would have changed the result in these proceedings. We conclude that the error was harmless.

In summary, this case consists of difficult issues to resolve, and we fully recognize our decision has enduring consequences for both families and N.A.P. These issues were fully litigated before a very experienced and capable district court judge, and the court's ruling has been carefully reviewed. We conclude the district court correctly construed K.S.A. 59-2115 and there was substantial competent evidence to support its findings and determination that K.P.'s consent to adoption of N.A.P. should not be set aside.

Affirmed.