(21 P.3d 581)
No. 85,224
IN THE MATTER OF THE ADOPTION OF BABY GIRL T.

Opinion filed March 23, 2001.

*William Rex Lorson*, of Salina, for appellant.

*Martin W. Bauer*, of Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., of Wichita, for appellees.

Before RULON, C.J., ELLIOTT, J. and WAHL, S.J.

RULON, C.J.: T.A.T., the birth mother of Baby Girl T, appeals from the district court's denial of her motion to revoke her consent to the adoption of Baby Girl T. We affirm.

The material facts are as follows:

The birth mother has lived with her mother, M.W., her stepfather, J.W., her full sister, and her two half-sisters since she was 4 years old. The birth mother's relationship with her stepfather had been continually strained. Although J.W. adopted the birth mother's full sister shortly after J.W. married M.W., the birth mother refused to consent to being adopted by J.W.

The situation worsened in 1994 when J.W.'s eldest daughter engaged in writing bad checks, which placed a financial hardship on the family as J.W. attempted to assist his daughter in paying her debts. As a result, tension threatened to disrupt the relationship between J.W. and M.W. M.W. threatened to divorce J.W. unless he quit assisting his eldest daughter. J.W. ultimately complied but estranged his daughter in the process.

J.W. blamed M.W. for the schism in his relationship with his daughter and his parents. J.W. warned the birth mother not to make the same mistake his daughter had made. M.W. pushed the birth mother to excel in school and to avoid behavior that J.W. could use to justify expelling her from the home. The birth mother excelled in school, earning a grade point average exceeding 3.8 and held various class offices.

However, despite M.W.'s attempts to control the birth mother's behavior, the birth mother became sexually active. When M.W. discovered the birth mother was engaging in sexual activity, M.W.

took her to Statcare for a shot of Depo Provera, a contraceptive. Yet, in spite of the precautions, the birth mother discovered she had become pregnant in May 1999.

Initially, the birth mother attempted to hide the pregnancy, fearing the reaction of M.W. and J.W., her classmates, and her teachers. She shared the knowledge of her pregnancy only with a close friend.

Eventually, M.W. noticed the birth mother had gained weight and asked her if she was pregnant. When the birth mother confessed she was 8½ months along in her pregnancy, M.W. began calling adoption agencies without consulting the birth mother. M.W. also scheduled an appointment with a local doctor. Throughout M.W.'s intervention upon learning of the pregnancy, the birth mother did not object to her mother's suggestion to enter an adoption plan for the baby.

By the time the birth mother attended an appointment with a gynecologist, Dr. M.B., she represented a decided intent to place the child for adoption. K.R., the administrative assistant to Dr. M.B., presented the birth mother with the portfolios of Mr. and Mrs. A who were interested in adopting. K.R. offered to call Mrs. A so that the birth mother could ask some preliminary questions. As a result of the telephone conversation, the birth mother agreed to meet Mrs. A. as a prospective adoptive parent for her baby.

The birth mother visited with Dr. M.B. and then joined K.R. and Mrs. A. at a local restaurant. Mrs. A. explained her previous adoption experience with the birth mother, describing the open adoption process and visitation of the birth family on special occasions. At trial, the testimony regarding the extent of the visitation discussed that evening was conflicting.

The birth mother felt comfortable with Mrs. A. and invited her to view the sonogram scheduled for the following day. She also made arrangements to meet with Mrs. A. and Mrs. A.'s attorney following the sonogram.

At the meeting Mrs. A.'s attorney, J.B.A., informed the birth mother that she had handled Mrs. A.'s previous adoption and that Kansas law does not prohibit an attorney from representing both the adoptive parents and the birth mother in an adoption. J.B.A.

further explained that, should a conflict arise between the birth mother and the adoptive parents, J.B.A., as the attorney for both parties, must withdraw from representation of either side.

Additionally, J.B.A. told the birth mother how she had become interested in working on adoptions, discussed some of the legal requirements for adoption, and emphasized the need to obtain the consent of the birth father, if he was known. The birth mother, fearing the birth father's mother would demand rights to the child, told J.B.A. and Mrs. A that she did not know the identity of the baby's father. Again, the testimony concerning what was discussed about visitation after the adoption is disputed.

Eventually, the birth mother informed Mrs. A. and J.B.A. that she knew the identity of the birth father and was able to contact him. M.W. also revealed that she knew the identity of the birth father but explained her hesitancy with allowing the paternal grandmother visitation with the child. Mrs. A. reassured M.W. that any visitation would be supervised.

J.B.A. scheduled a meeting between the adoptive parents and the birth parents at a local restaurant. The birth mother, her current boyfriend, M.W., E.P. (the birth father), J.B.A., and Mr. and Mrs. A. attended. The birth mother brought several documents with her that J.B.A. had previously mailed to her.

Starting with E.P.'s documents, J.B.A. reviewed each document with the birth mother and E.P. before requesting that E.P. sign a pre-birth consent to adopt. After E.P. had signed and left the restaurant, J.B.A. explained that the birth mother's documents were similar to those just reviewed with E.P., except that pre-birth consent was not binding and that she retained the right to withdraw her consent at any time until she had signed the final consent following the birth of the child. J.B.A. provided the birth mother with an opportunity to ask questions about the documents. When the birth mother asked about the consequences of signing the pre-birth consent and then withdrawing her consent to adopt, J.B.A. explained that the birth mother would be responsible for the costs of the birth.

On December 27, 1999, the birth mother kept an appointment with Dr. M.B., who authorized the inducement of labor. She im-

mediately checked into the hospital under an assumed name. The birth mother was accompanied to the hospital by M.W., Mrs. A., and L.B., a close friend.

While waiting for labor to begin, the birth mother talked with Mrs. A. about the baby, although the interpretations placed on the conversation by the birth mother and Mrs. A. diverged greatly.

At 5:15 a.m. on December 28, 1999, the birth mother delivered a healthy baby girl. Mrs. A. and L.B. were present for the delivery.

The birth mother remained animated and alert after giving birth, not needing heavy medication, and her conversation remained lucid as she expressed a continued desire to proceed with the adoption. J.B.A. called shortly after the birth to confirm the arrival of the baby and, subsequently, called the birth mother to request a meeting at the hospital to sign the final consent forms at 5:30 p.m. that evening. The birth mother agreed.

At no time, during or after the birthing process, did the birth mother express a reluctance to carry through with the adoption. Even when Dan Gard, the hospital social worker, came to inquire about her decision regarding the placement of her child for adoption, the birth mother confirmed her desire to proceed with the adoption.

At 5:30 p.m., the birth mother, M.W., Mr. and Mrs. A., E.P., J.B.A., and Dan Gard met in a hospital lounge so the birth mother could sign the final consent to adopt. After signing the papers, she asked to go home. After a short delay in which the birth mother was examined prior to release, M.W. drove her home.

The next morning the birth mother called the hospital wanting to speak to Mrs. A. but upon discovering that Mrs. A. was unavailable, simply told a nurse that she was having second thoughts about placing the child for adoption. When M.W. awoke, she noticed the telephone directory open to the hospital's number, so she confronted the birth mother who then expressed her desire to revoke her consent to adopt. M.W. called an attorney who advised M.W. that the only method of regaining the child after the consent to adopt was final was to ask the adoptive family to return the child.

The birth mother returned to the hospital with the purported intent of asking M.W. to seek return of the child. The birth mother,

afraid of angering Mrs. A., requested her mother to ask for the child. Mrs. A. refused to return the child.

The birth mother then asked her mother to make an appointment with an attorney to determine whether she could lawfully revoke her consent to adopt. Later, the birth mother canceled the appointment when she was able to visit the child at Mr. and Mrs. A.'s home. Between December 31, 1999, and January 22, 2000, the birth mother visited Mr. and Mrs. A.'s home nine times. She admitted that neither Mr. nor Mrs. A. ever denied her a requested visit.

However, during the visit on January 22, Mrs. A. informed the birth mother that she should consider reducing the frequency of her visits because Mr. A. was not comfortable. The birth mother then realized that her concept of "open" adoption was dissimilar to that held by Mr. and Mrs. A.

The birth mother filed the present motion for revocation of consent to adopt on January 26, 2000. After 3 days of trial, the district court considered the evidence and the parties' trial briefs before determining that revocation was not proper under the factual circumstances presented. The court denied the motion.

## Revocation of Consent

In her motion to revoke her consent, the birth mother argued her consent was not freely and voluntarily given. Nevertheless, the district court specifically held that the birth mother deliberately established an adoption plan to accomplish several goals and that only after signing an informed and voluntary consent to adopt did she begin to second-guess her choice.

An appellate court's role in reviewing a motion to revoke a consent to adopt is to determine whether the district court's findings of fact and conclusions of law are supported by substantial competent evidence. Substantial evidence possesses both relevance and substance, furnishing an adequate basis of fact from which the legal conclusions may be drawn. See In re J.A.B., 26 Kan. App. 2d 959, 961, 997 P.2d 98 (2000).

Here, the birth mother attempts to dissect the voluntariness arguments by distinguishing the conduct of the adoptive parents and

her coercive home environment from the conduct of attorney J.B.A. as a basis for revoking her consent. However, the birth mother concedes, whether J.B.A. adequately explained the legal effect of the adoption is not a separate basis for revoking a consent to adopt but merely a factor the district court must consider in determining whether the consent was entered into voluntarily and knowingly. See *In re Adoption of N.A.P.*, 23 Kan. App. 2d 257, 266, 930 P.2d 609 (1996), *rev. denied* 261 Kan. 1085 (1997).

The birth mother's argument that her consent was obtained as a consequence of coercion and fraud relies upon three factual allegations: (1) that the birth mother's consent was premised upon an agreement that she could visit at any time; (2) that J.B.A. failed to adequately explain the legal implications of the pre-birth and post-birth consent forms; and (3) that the birth mother's home and school environments placed undue pressure upon her to adopt rather than keeping the child.

The district court, in its findings of fact regarding visitation, found that any visitation agreement to see the child at any time was purely the invention of the birth mother. The court found no written record of such a visitation agreement and no corroboration from any witnesses other than the testimony of the birth mother, M.W., and L.B. The court specifically found the evidence did not support such an interpretation of the events.

Here, the birth mother, M.W., and L.B. all testified that Mrs. A. promised the birth mother visitation whenever she wanted to see the child. But, both Mr. and Mrs. A. denied extending such a promise. Moreover, J.B.A., Dan Gard, and E.P. testified that such a promise was never made within their hearing. Additionally, none of the written documents supports a finding of unrestricted visitation. The consent form clearly states: "I wish to sign this consent and understand that by signing this consent I do permanently give up all custody and other parental rights I have to such child."

Furthermore, a letter of commitment for private adoption from J.B.A. to the birth mother states: "[My attorney] has explained to me that if there is an understanding with the adoptive parents regarding 'openness' updates and/or ongoing visitation that if at some future date the adoptive couple decides that such 'openness'

is not in the best interest of the child, I cannot use that issue as a basis to overturn the adoption."

The birth mother admitted that she understood that signing the consent form meant she would release all rights to her child and acknowledged such decisions concerning visitation would be left to the discretion of the adoptive parents. However, she testified that her understanding of a denial of visitation in the best interests of the child was limited to conduct which threatened the welfare of the child.

While the birth mother's perception of the meaning given to "the best interests of the child" is not contradicted, there is no indication that she shared that interpretation with anyone. Nor is there any indication that the terms of any visitation were discussed. We are satisfied the district court's refusal to rely upon the birth mother's interpretation of the "best interests of the child" clause in the consent agreement to establish the existence of a visitation agreement is reasonable and supported by the weight of the evidence.

Even the letters within Mr. and Mrs. A.'s portfolio discussing visitation between a prior adopted son and his birth family do not support the birth mother's argument. Such letters are evidence only of Mr. and Mrs. A.'s willingness to allow some visitation under appropriate circumstances. There is nothing within the letters to indicate that such visitation is desirable or intended within the present circumstances. In any case, there is nothing about the letters which suggests that visitation for their prior adopted son is not entirely within the discretion of Mr. and Mrs. A.

K.S.A. 59-2114 provides that a person wishing to revoke a consent to adopt must establish the consent was not freely and voluntarily given by clear and convincing evidence. This burden of proof is more substantial than a mere preponderance of the evidence. Because the district court denied the birth mother's motion for revocation of her consent, the court implicitly held the movant had not sustained her burden of proof, which amounts to a negative finding of fact. See *Adoption of N.A.P.*, 23 Kan. App. 2d at 267.

" 'Absent arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice the finding of the trial judge cannot be

disturbed. An appellate court cannot nullify a trial judge's disbelief of evidence nor can it determine the persuasiveness of evidence which the trial judge may have believed.' " *Adoption of N.A.P.*, 23 Kan. App. 2d at 267 (quoting *Mohr v. State Bank of Stanley*, 244 Kan. 555, 568, 770 P.2d 466 [1989]).

As previously stated, this record supports the findings made by the district court. The court's finding there was no promise of visitation to influence the birth mother's decision to sign the adoption consent is not erroneous.

Moreover, even if the birth mother could have established a binding visitation agreement, she cannot demonstrate such an agreement influenced her decision to place the child for adoption. She clearly testified that, regardless of a promise of visitation, she felt compelled by the circumstances within her home to sign the consent. Arguably, the only reasonable finding to be made from this testimony is that, had the consent form specifically stated that no visitation was to be allowed, the birth mother would have still proceeded with the adoption. Consequently, we are unable to conclude the misunderstanding regarding visitation constitutes fraud, misunderstanding, or duress which vitiated the voluntariness of the birth mother's consent, compelling her to place her child for adoption against her will.

The birth mother additionally contends that J.B.A.'s improper representation provides grounds to revoke her consent to adopt. She argues that, although she held responsible positions within the school governing body and maintained a high grade point average, she had never before dealt with contracts or legal responsibility. She claims that J.B.A.'s failure to provide complete and private legal advice renders her consent invalid. We disagree.

In Kansas, legal representation of both the adoptive parents and the birth parents is permitted subject to certain conditions. *In re Adoption of Irons*, 235 Kan. 540, 549, 684 P.2d 332 (1984). One of those conditions is that the attorney must obtain the consent from both parties being represented after fully disclosing the foreseeable consequences of the dual representation. Supreme Court Rule 1.7 (2000 Kan. Ct. R. Annot. 339). This record supports the district court's finding that J.B.A. fully disclosed her representation to both parties.

The *Irons* case imposes a duty of good faith to inform both parties of the legal consequences of their actions, in this case, the legal consequences of adoption. 235 Kan. at 549. Again, this record supports the district court's finding that J.B.A. explained the legal effect of the birth mother's consent to adoption was to terminate all legal rights and responsibilities affecting the child. In any event, the birth mother admitted she was aware of the effect of her consent.

The birth mother now claims that J.B.A.'s good faith duty demanded an explanation of the options available to an unwed mother. Assuming, without deciding, that an attorney owes such a duty and that J.B.A. failed to perform that duty, the birth mother fails to demonstrate how the failure affected her ability to freely and voluntarily consent to the adoption of her child. This record is clear that the birth mother was aware the option of keeping her child remained open to the point she signed the final consent form.

This record clearly shows the birth mother never expressed any doubts about placing her child for adoption before consenting to the adoption. We are satisfied that it is not unreasonable for an attorney, under the circumstances shown here, to fail to inform an unwed mother about community programs designed to assist unwed mothers in caring for their children.

As a note for future reference, an attorney representing both sides of an adoption would be well advised to visit with the birth mother or birth father individually, explaining each section of the adoption consent, allowing time for questions after each section, perhaps asking the birth parent to initial each section as he or she reads the section to ensure the client has an opportunity to disclose information to the attorney without fear of recrimination from parents, spouses, or the adoptive family.

Here, the district court specifically found the birth mother chose adoption to fulfill several objectives: (1) she feared prejudice from her peers and her teachers at school based upon her pregnancy out of wedlock; (2) she wanted to avoid aggravating her already strained relationship with her stepfather; (3) she wanted to prevent the paternal birth grandmother from having unsupervised visitation with the child; (4) she wanted to attend college; (5) she wished to

remain in her mother's house and feared she would be expelled if her stepfather learned of the pregnancy before an adoption plan was established; (6) she did not wish to repeat her mother's experience as an unwed mother; and (7) she feared that she would be incapable of supporting the child. All of these findings are supported by the birth mother's testimony.

Even if the birth mother was counseled about alternatives to adoption and discovered the means to financially support the child as well as attend college, there is no indication these facts would have had any effect on her fear of her stepfather's reaction or affect the social stigma her pregnancy would cause at school. The birth mother has not established with clear and convincing evidence that J.B.A.'s failure to advise her of community programs that would enable her to keep her child would have affected her decision to place the child for adoption at the time the consent was signed. As such, an alleged failure in representation on the part of the birth mother's attorney does not provide a basis for overturning the challenged consent in this case.

Next, the birth mother suggests the pressures she received from her mother and stepfather to place the child for adoption controlled her life. The birth mother further feared the societal pressures imposed upon her by community standards disapproving of pregnancy out of wedlock. Without minimizing the impact such pressures might bear upon the psyche of a young, high school-aged, unwed mother, the district court concluded such influences did not overcome the birth mother's will, forcing her to place her child for adoption involuntarily. Such finding is substantiated by the record.

### Constitutionality of the 12-hour waiting period

The birth mother's final argument relates to the constitutionality of K.S.A. 59-2116. As we understand, she argues that because the statute arbitrarily provides greater protection to persons who relinquish their parental rights within the 12-hour period following the child's birth, the statute violates her due process and equal protection rights under the Fourteenth Amendment.

The constitutionality of a statute is a question of law, a question over which this court has unlimited review. *Hart v. Kansas Board of Healing Arts,* 27 Kan. App. 2d 213, 218, 2 P.3d 797 (2000). An appellate court presumes a statute is constitutional and resolves any doubt in favor of upholding its validity. Before an appellate court may strike a statute as unconstitutional, a review of the statute must clearly reveal, beyond substantial doubt, that no reasonable construction will bring the statute into conformity with the mandates of the state or federal constitutions. See *State ex rel. Tomasic v. Unified Gov. of Wyandotte Co./Kansas City,* 264 Kan. 293, 300, 955 P.2d 1136 (1998).

Without question, the Fourteenth Amendment protects the parent/child relationship as a fundamental liberty interest which cannot be abrogated by the State without compelling interest. *In re Adoption of C.R.D.,* 21 Kan. App. 2d 94, 98, 897 P.2d 181 (1995). However, neither the Due Process nor the Equal Protection Clauses prevent an individual from voluntarily relinquishing their legal rights and responsibilities to a child. See *Pfoltzer v. County of Fairfax,* 775 F. Supp. 874, 881-82 (E.D. Va. 1991), *aff'd* 966 F.2d 1443 (4th Cir. 1992) (citing *Weller v. Dept. of Soc. Serv. for Baltimore,* 901 F.2d 387, 392 [4th Cir. 1990], holding that " '[i]f one voluntarily surrenders a liberty interest to the State, there has been no "deprivation" of that interest by the State, and no due process violation' "). ·

A signed consent is *prima facie* evidence of a parent's intent to voluntarily relinquish his or her rights to a child, and due process only requires notice and a hearing upon the voluntariness of such a parent's actions. The birth mother has taken advantage of her due process rights to challenge the validity of her consent by arguing that she did not voluntarily consent. Due process affords no greater protection.

The birth mother argues that K.S.A. 59-2116 arbitrarily causes a disparate treatment among similarly situated individuals, distinguished only by the timing of the relinquishment of their rights. She further contends the challenged statute violates equal protection by treating her differently regarding a fundamental liberty interest.

This court first considered the effect that the execution of a consent to adoption had on the voluntariness of that consent in *In re Adoption of Baby Girl H.*, 12 Kan. App. 2d 223, 739 P.2d 1 (1987). Realizing that the voluntariness of a person's consent is influenced by the circumstances of each case, we refused to establish a "bright line" rule to address the appropriate timing of a voluntary consent but indicated the legislature could adopt a waiting period as deemed necessary for public policy. 12 Kan. App. 2d at 231.

After the legislature enacted K.S.A. 59-2116 in 1990, providing that an adoption consent executed within 12 hours of the birth is voidable, our Supreme Court construed the statute in the context of determining whether a birth mother must exercise the statutory right to revoke a voidable consent prior to the issuance of a final adoption decree. See *In re Adoption of J.H.G.*, 254 Kan. 780, 869 P.2d 640 (1994). Finding the legislature clearly intended to balance the interests of a birth mother's need to contemplate the decision to place a child for adoption with the child's need for stability and finality, the court concluded the legislature intended the time limitations of K.S.A. 59-2114 to be read in conjunction with the waiting period of K.S.A. 59-2116. See 254 Kan. at 789-91.

Important to our determination of this issue is our emphasis upon the intent of the legislature. Contrary to the birth mother's assertions here, the legislature clearly contemplated the public policy considerations of a 12-hour waiting period. 254 Kan. at 789-91 (quoting the minutes of the Judicial Council Family Law Advisory Committee meetings for December 10, 1987, July 7, 1989, and October 6, 1989). We conclude the legislature wanted to protect birth mothers from being coerced into signing a consent while under the influence of pain or pain-inhibiting medication, while balancing the need for permanency in the legal status of the child.

Clearly, by promulgating the 12-hour waiting period mandated by K.S.A. 59-2116, the legislature did not limit a birth mother's rights regarding her child, but extended greater protection than that afforded by the Due Process Clause of the Fourteenth Amendment. The legislature provided for a legal attack on a consent by a birth mother which was induced by fraud, coercion, mis-

take, or lack of understanding. K.S.A. 59-2114; see generally *In re J.A.B.*, 26 Kan. App. 2d 959, 966, 997 P.2d 98 (2000) (describing what may rebut the presumption of validity of a final consent).

The issue before us is not whether the Kansas Legislature may limit fundamental rights to a disparate class, which invokes a level of strict scrutiny, but whether the legislature may grant greater constitutional protection to a disparate class. Accordingly, the birth mother's assertion that this court should apply strict scrutiny to a review of the statute is misplaced. The birth mother's constitutional rights have not been limited, nor does the statute discriminate between members of a suspect classification requiring heightened scrutiny; the only classification is one based on the time in which the consent was obtained. The proper level of scrutiny to consider is whether the legislature had any rational basis for distinguishing between birth mothers who sign a consent within the first 12 hours following the birth and those who sign after the first 12 hours following the birth. See *U.S.D. No. 443 v. Kansas State Board of Education*, 266 Kan. 75, 88-89, 966 P.2d 68 (1998).

We conclude the legislature desired to limit the waiting period provided in K.S.A. 59-2116 to assist a determination of permanency for the child. A valid public policy concern is that the legal status of children should not be suspended for a longer period of time than necessary to effect a valid adoption. As a result, the legislature's decision to treat similarly situated birth mothers differently on the basis of the timing of their consent is reasonable. The statutory waiting period found in K.S.A. 59-2116 does not offend either our state or federal Constitutions.

Affirmed.