No. 91,469

STATE OF KANSAS, *Appellee*, v. JORGE SANCHEZ GONZALEZ, *Appellant*.

145 P.3d 18

74

Opinion filed October 27, 2006.

*Virginia A. Girard-Brady*, assistant appellate defender, argued the cause and was on the brief for appellant.

*Don L. Scott*, county attorney, argued the cause, and *Phill Kline*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Jorge Sanchez Gonzalez was convicted by a jury of one count of premeditated first-degree murder in violation of

K.S.A. 21-3401(a), one count of attempted first-degree murder in violation of K.S.A. 21-3301 and K.S.A. 21-3401(a), and one count of discharging a firearm at an occupied vehicle in violation of K.S.A. 2005 Supp. 21-4219, for crimes committed in August 1997. In his appeal pursuant to K.S.A. 22-3601(b)(1), he raises six errors.

More specifically, the defendant contends we must reverse his convictions based upon the trial court's (1) exclusion of Dr. Huddleston's expert opinion based upon defendant's California medical records, (2) admission of his unredacted videotaped interview, (3) admission of his confession, (4) failure to instruct on his theory of self-defense, (5) consideration of his prior conviction for sentencing purposes without a jury determination of the conviction, and (6) cumulative error.

## FACTS

On Sunday, August 17, 1997, at approximately 11:14 p.m., Liberal, Kansas, police officer Randy D. Schafer was on routine patrol when he noticed a tan Lincoln, with its headlights off, either parked or moving very slowly in an alley behind a Motel 9. Suspicious because of recent burglaries in the area, Officer Schafer pulled his patrol car onto a dirt road perpendicular to the alley, between the Motel 9 and a Love's Country Store. The Lincoln was moving from behind the Motel 9 at "about two or three miles per hour."

As the Lincoln pulled directly in front of the patrol car's headlights, Officer Schafer saw a Hispanic male, on foot, approach the Lincoln from behind. Upon reaching the Lincoln's rear bumper, the Hispanic male fired approximately four shots with a handgun into the Lincoln which then accelerated down the alley. Officer Schafer lost sight of the fleeing shooter, but followed the Lincoln as it sped down the alley and across a street, crashing into the side of a building. The Lincoln's passenger, Nick Heathman, ran toward Officer Schafer's patrol car; he was bleeding from the mouth, missing some teeth, and spit out a bullet. The driver, Juan Carlos Lozoya, was unconscious in the Lincoln and bleeding from the chest; he later died from his injuries.

Heathman testified that he and Lozoya were driving around that night waiting for Heathman's mother to finish work. As they twice

drove by Love's Country Store, Heathman and Lozoya noticed two males standing in front, gesturing at them; Heathman believed these gestures were gang signs. Heathman recognized one of the men as "Silent" and identified "Silent" as defendant Jorge Sanchez Gonzalez.

Lozoya turned into the alley behind Love's and turned off his headlights. At the preliminary hearing, Heathman testified that Lozoya turned the lights off to surprise the men, intending to start a fight. At trial, Heathman denied knowing what Lozoya's intentions were. They both noticed Officer Schafer and turned the headlights back on. Suddenly, Lozoya yelled, "Look out!" Heathman noticed a man pointing a gun at them, who immediately began to shoot. Lozoya fell onto Heathman and the car accelerated. Heathman unsuccessfully tried to apply the brakes from the passenger side. Heathman's injuries included 300 to 500 stitches, the loss of a sinus cavity, the loss of six teeth, numerous surgeries, and back problems.

Officer Shannon M. Davis and Sergeant Daniel Yorio were among officers called to the scene. They located a .38 Smith and Wesson handgun with a silver barrel and wood grips on the front porch of a house approximately 75 feet from the scene of the shooting. At Lozoya's autopsy, Captain Charles Maddox recovered a bullet from Lozoya's body. Testing by Kansas Bureau of Investigation (KBI) forensic science laboratory personnel revealed that the bullet was fired from the gun found on the front porch.

Police investigators also found a number of items of clothing in the vicinity of the crime scene, which included a bandanna, a glove, a sweatshirt, and a pair of pants. Crime scene technicians found a cigarette butt in the pocket of the pants. The KBI forensic science laboratory later matched DNA found on the cigarette butt to that of defendant.

Jose Soto testified that defendant had lived with him and his family during 1997. Soto related a conversation that defendant had with him on Tuesday, August 19, 2 days after the shooting. Defendant told Soto that he had gone to Liberal looking for Max Romero, whom defendant blamed for a drive-by shooting at the Soto house some months earlier. While he did not find Romero, he bragged about shooting "two guys" in the alley behind Love's

store with a .38 special, as he believed they were rival gang members. He fled, discarding an outer layer of clothing as he ran. On cross-examination, Soto stated that defendant had previously stolen a cell phone from Lozoya at knifepoint, and that Lozoya had threatened to come back with a gun. He also stated that defendant had said that Lozoya had reached down shortly before the shooting, and that defendant said he "didn't know if they had something."

Defendant was arrested for the shooting, but was released after 2 months for lack of evidence. Approximately 2 years later, on November 9, 1999, defendant was arrested by officers of the Anaheim, California, Police Department for robbery. Anaheim Police Department Detective Ty Hagenson conducted a videotaped interview with defendant shortly after this arrest.

After being read his *Miranda* rights, defendant indicated a willingness to speak. During the course of this interview, defendant indicated that he had been convicted of murder in Kansas, sentenced to 25 years to life, but had been released after 4 months due to a mistake. When asked about details of the shooting, defendant described shooting into a yellow Lincoln in an alley behind a convenience store, killing "Carlos." He said that a police officer witnessed the shooting, and he described the gun used in the shooting as a chrome Smith and Wesson .38 revolver with wood grips. He also said that he left the gun about a block from the scene of the shooting and described how he escaped by discarding an outer layer of clothing as he fled the scene. Based on this information, defendant was arrested by Kansas authorities.

After the defendant was charged by complaint, the State and defendant's attorney filed a joint motion to determine defendant's competency; the trial court ordered that defendant undergo an examination at the Larned State Security Hospital. The report received from that examination determined that defendant was competent to stand trial. At the first competency hearing, defense counsel requested that he be granted an opportunity to secure a second opinion, which the trial court granted.

The second evaluation was conducted by Dr. Carolyn Huddleston, clinical psychologist, in June 2002. Dr. Huddleston concluded that defendant was incompetent to stand trial. She acknowledged,

however, that in the absence of defendant's prison medical records from California, she would have found defendant competent. On objection from the State, the trial court ruled that the California records were inadmissable hearsay and could not be relied upon to form the basis of Dr. Huddleston's opinion. The trial court concluded that defendant was competent to stand trial.

Prior to trial, defense counsel filed a motion in limine asking that defendant's videotaped interview with California officers be partially redacted to exclude prior crimes and civil wrongs. Defense counsel also filed a motion to suppress the videotape on the grounds that the interview was involuntarily given. Both motions were denied by the trial court. The trial court did give a limiting instruction to the jury, advising the jury that it should not consider evidence of crimes other than the one charged in determining defendant's guilt.

At trial, defendant requested a self-defense instruction. The trial court found that there was no evidence to support such a theory, but it did give an instruction on the lesser included offense of voluntary manslaughter, based on an "unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person."

Upon conviction, defendant was sentenced to life in prison with the possibility of parole after 25 years for first-degree premeditated murder; to a standard sentence of 776 months for attempted first-degree murder, to be served consecutive to the murder sentence; and to 12 months for discharge of a firearm, to be served concurrent with his other sentences. His motions for a judgment of acquittal and for a new trial were denied. The appeal and defendant's assignment of errors follow.

## (1) Exclusion of Dr. Huddleston's Expert Opinion Based Upon Defendant's California Medical Records

Defendant contends that it was error for the trial court to exclude Dr. Carolyn Huddleston's opinion that defendant was incompetent to stand trial. Dr. Huddleston easily qualified as an expert witness with approximately 20 years' experience as a licensed clinical psychologist in conducting competency evaluations. On a hear-

say objection by the State, the trial court ruled that Dr. Huddleston's opinion that defendant was incompetent to stand trial was not admissible because it was based upon California medical records of defendant which had not been offered or admitted into evidence. Moreover, the trial court determined that the opinions expressed in the California records were by medical personnel not present for defendant's hearing on competency. The trial court admitted the California records as an appellate exhibit but ruled that such records constituted inadmissible hearsay based upon *West v. Martin*, 11 Kan. App. 2d 55, 60-61, 713 P.2d 957, *rev. denied* 239 Kan. 695 (1986), which held that "[e]xpert testimony founded upon hearsay is inadmissible and contrary to K.S.A. 60-456(b)."

Prior to issuing its final ruling, the trial court requested that the parties file briefs regarding their respective positions on the admissibility of the California medical records. Both parties responded and presented the same arguments on appeal as reflected in their appellate briefs. As the trial court's exclusion of the expert testimony was based on its determination that the records were not authenticated and were inadmissible hearsay, we apply the following standards of review.

"When the admission or exclusion of evidence is raised at trial, an appellate court first considers whether the evidence is relevant. [Citation omitted.] Relevant evidence is 'evidence having any tendency in reason to prove any material fact.' [Citation omitted.] 'Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question.' [Citation omitted.]" *State v. Ross*, 280 Kan. 878, 881, 127 P.3d 249 (2006).

Relevant to this case, the admission of hearsay evidence (*i.e.*, California records) "is controlled by statute and requires the interpretation of a statute. This court reviews the interpretation of a statute as a question of law, using a de novo standard. [Citation omitted.]" *State v. Franklin*, 280 Kan. 337, 341, 121 P.3d 447 (2005).

Subject to exclusionary rules, an appellate court's standard of review regarding a trial court's admission of evidence is abuse of discretion. "Judicial discretion is abused when judicial action is

arbitrary, fanciful, or unreasonable. [Citation omitted.]" *State v. Patton*, 280 Kan. 146, 156, 120 P.3d 760 (2005); see also *State v. Corbett*, 281 Kan. 294, 130 P.3d 1179 (2006) (admissibility of expert witness' testimony is determined by the trial court in its exercise of discretion).

Before considering the defendant's contention, some background evidence is helpful in framing the issue we must resolve. In January 2002, the State and defendant's attorney filed a joint motion to determine competency, on the basis of which the trial court ordered a mental evaluation. The first competency hearing was held on May 14, 2002. Just prior to the first witness being called, the defense asked for a continuance in order to obtain a second expert's opinion on defendant's competence to stand trial, citing strange behaviors on defendant's part, as well as defendant's inability or unwillingness to assist with his own defense. The trial judge granted the continuance but had the State call the witnesses it would have called had the defense presented a report suggesting defendant's incompetence.

The State's primary witness was Dr. Robert Huerter, a psychologist at Larned State Security Hospital who had performed over 100 competency evaluations; he was qualified as an expert without objection. Dr. Huerter's initial evaluation concluded that defendant was aware of the "nature and purpose of the legal proceedings" which were about to be brought against him, and that "he has given clinical staff no reason to think that he is experiencing hallucinatory phenomena, delusional beliefs, acute emotional distress, or mental retardation which would interfere with his ability to cooperate with his preparing a legal defense with an attorney."

Dr. Huerter testified that while defendant was uncooperative and sometimes vulgar,

"[i]t was obvious that [the defendant] was not experiencing deteriorated functioning. He was able to brush his teeth; he was not talking to himself. He was not seemingly in emotional distress in the sense that he was trying to harm himself. He was not trying to hit himself. He was not asking for assistance from nursing staff, or when he wanted assistance from nursing staff he was able to ask for it."

Dr. Huerter was unable to effectively interview defendant at any time during defendant's stay at Larned, but testified that he found

no evidence of any mental illness or defect at any time. He further testified that defendant was "very much aware" that he was in serious legal trouble, but was unable to say exactly how much trouble defendant believed himself to be in.

On cross-examination, Dr. Huerter acknowledged that he made no inquiry into any psychological problems defendant may have had in the California court system. He further stated that, based on his observations in the courtroom at the time of the hearing, he did not believe that defendant was suffering from a major mental illness that would prevent him from assisting in his defense.

The second competency hearing took place on September 11, 2002. The defense called Dr. Carolyn Huddleston, who was certified without objection as an expert. Dr. Huddleston testified that she had attempted to conduct a psychological evaluation of defendant in person, but had found him uncooperative. As a result, she based her evaluation largely on written records from the California penal system and, to a lesser extent, on the videotaped interview with Anaheim police, on the Larned evaluation, and on conversations with defendant's attorneys and jailers.

According to Dr. Huddleston, defendant's jailers reported certain bizarre behaviors on defendant's part. However, Dr. Huddleston testified that these observations "did not make me find [defendant] incompetent until I had read the California records. *Without the California records I would not have found him incompetent even knowing these things about what he was doing."* (Emphasis added.)

When defense counsel's questions began to focus on what the California records reflected, the State objected on the grounds that the records had not been admitted into evidence and on the basis that the recorded writings constituted hearsay opinions of other experts not present for defendant's hearing. Defendant made no attempt to qualify the records for admission into evidence under one of the exceptions to the hearsay rule, K.S.A. 60-460. Nor did defendant ever offer the California records into evidence.

The trial court sustained the State's objections on hearsay grounds. Moreover, the trial court noted that the California records

were not accompanied by an affidavit of the custodian and were not properly authenticated.

The California records cover a time period from May 2, 2000, through November 21, 2001, and were admitted by the trial court as an appellate exhibit (Exhibit A, consisting of some 33 pages). Highly summarized, the records include mental health screening reports generated from recorded observations of defendant with conclusions by clinical psychologists, medical doctors including psychiatrists, and nurses; hourly progress notes regarding inpatient treatment of defendant together with inpatient medication administration; mental health consultations; interdisciplinary treatment team conclusions; and discharge diagnosis. The records contain detailed medical information, including numerous recorded fights defendant was involved in while incarcerated, statements indicating defendant was involved with heavy marijuana and crystal meth use on a daily basis before his incarceration, a Diagnostic and Statistical Manual—IV diagnosis made by clinical psychologist Dr. Carmen E. Reed, assessments by Bruch Bogost, M.D., reports and diagnosis of clinical psychologist Dr. Joseph K. Jankovitz, mental health placement report with Global Assessment of Functioning Scale scores signed by psychiatrist Dr. O. Kamson, a complete psychiatric evaluation and discharge summary for inpatient admission on February 6, 2001, and a discharge summary on February 20, 2001, with a discharge diagnosis of psychotic disorder, schizophrenia, chronic paranoid type, noncompliance with antipsychotic medications, and personality disorder prepared by staff psychiatrist Dr. E. Morong on April 30, 2001, and observations and assessment by Senior Psychologist Harry Tayler, Ph.D., together with detailed medical observations by other medical staff personnel.

On request, Dr. Huddleston's written report was admitted into evidence, but the trial court indicated that, given how much of the report was impermissibly based on the California records, he would mark the sections he would consider "admissible and relevant in making [his] decision."

After a recess, the defense offered a certified letter from Sandra Lara, who is the legal custodian for health records in the California Department of Corrections. Defense counsel used the letter to

renew his objection to the exclusion of the California records. The letter, on Department of Corrections stationary, was signed by Sandra E. Lara, certifying that she was "the legal custodian of Health Records for inmates committed to CALIFORNIA DEPARTMENT OF CORRECTIONS (CDC), California State Prison-Los Angeles County," in which facility defendant was incarcerated, and that "the enclosed Health Record documents for inmate/patient GEORGE G. SANCHEZ" were "true copies from the original Unit Health Record" maintained in her custody. The trial court admitted the letter as an appellate exhibit and noted that it was not sworn to, or accompanied by an affidavit, but was simply "certified."

Dr. Robert Huerter was recalled to the stand and testified that he had reviewed the California records, as well as listened to Dr. Huddleston's testimony, and that nothing had altered his initial opinion that defendant was competent to testify. However, on cross-examination, Dr. Huerter testified that he did not have an opinion as to whether defendant presently understood his legal predicament "to any specific degree"; nor could he say, to any specific degree, whether defendant was able to cooperate with his defense team.

At the end of the hearing, the trial judge, citing *West v. Martin*, 11 Kan. App. 2d at 60-61 ("Expert testimony founded upon hearsay is inadmissible and contrary to K.S.A. 60-456[b]."), indicated that he was inclined to disallow Dr. Huddleston's testimony insofar as it was based on inadmissible hearsay. However, he requested that both parties file briefs in support of their respective positions. Both parties responded, and their appellate briefs reflect the written and oral arguments made to the trial court.

In reaching a final ruling, the trial court first noted that a defendant is presumed competent, and that the defense bears the burden of proving by a preponderance of the evidence that he or she is incompetent. The trial court noted that the source of the State's objection to the California records was K.S.A. 60-456(b), which provides that expert testimony "is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and

(2) within the scope of the special knowledge, skill, experience or training possessed by the witness." The trial court determined that Dr. Huddleston's opinion that defendant was incompetent was based on hearsay and inadmissible, comparing Dr. Huddleston's opinion based upon the California records to the situation considered in *In re Watson*, 5 Kan. App. 2d 277, 615 P.2d 801 (1980):

"Defendant [Jorge Sanchez Gonzalez], as was true in *Watson*, made no attempt to place the California records into evidence, there was no effort made to show an exception to the hearsay rule and the Defendant did not attempt to qualify the reports as business records. Further, as was true in *Watson*, the records . . . are hearsay and any expert opinion based on these records is inadmissible."

Based on the evidence admitted at the competency hearing, the trial court concluded that defendant did not meet his burden of establishing he was incompetent to stand trial.

As can readily be observed by considering the above background information, the exclusion of Dr. Huddleston's opinion based on the California records is critical in this case. If properly excluded by the trial court, defendant's claim the trial court should have admitted Dr. Huddleston's testimony based upon the California records fails. If, on the other hand, the trial court erred, we must reverse the defendant's convictions and remand for another competency hearing. An examination of the two bases upon which the court excluded Dr. Huddleston's opinion demonstrate that no error occurred and that the trial court properly excluded Dr. Huddleston's opinion based upon the California records.

Authentication

While defendant never offered the California records into evidence, it is clear that the trial court determined that such records were not properly authenticated and therefore inadmissible. In this respect, the trial court was correct.

K.S.A. 60-464 requires authentication of a writing before it may be received in evidence. The California records upon which Dr. Huddleston's opinion was largely based were not original records but purportedly were copies of original records. Defendant offered no extrinsic evidence of authenticity. He attempted to authenticate

the copies of the California records only by means of the letter from Sandra Lara. K.S.A. 60-465 governs the authentication of copies of official records. As relevant, 60-465 provides that extrinsic evidence of authenticity as a condition precedent to admissibility is not required if the office in which the record is kept is within the United States and (1) the writing is attested to as a correct copy of the record by a person purporting to be an officer having legal custody of the record, and (2) is "authenticated by seal of the office having custody or, if that office has no seal, by a public officer having a seal and having official duties in the district or political subdivision in which the records are kept who certifies under seal that such officer has custody." While the letter from Lara is not in the form of an affidavit, it states it "serves as certification" that she is the legal custodian of the original California health records pertaining to defendant and that the copies of the records being forwarded are true copies of those original records. On its face the letter fails to meet the statutory requirements for authentication because it bears no seal. The trial court did not err in ruling the records were not properly authenticated and therefore inadmissible.

It should also be noted that failure to authenticate the California records properly precludes the records from being qualified for admission into evidence under the "Content of official record" exception to the hearsay rule, K.S.A. 60-460(o).

K.S.A. 60-460 provides in part:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

. . . .

"(o) *Content of official record.* Subject to K.S.A. 60-461 and amendments thereto, (1) if meeting the requirements of authentication under K.S.A. 60-465 and amendments thereto, to prove the content of the record, a writing purporting to be a copy of an official record or of an entry therein . . . ."

Had defendant attempted to offer the California records for admission into evidence under the official records exception to the hearsay rule, the failure to have the records properly authenticated would have precluded their admission.

Hearsay

The issue surrounding the California records also concerns K.S.A. 60-456(b), which provides:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

K.S.A. 60-456(b) thus precludes an expert witness in Kansas from giving an opinion based on facts or data not "perceived by or personally known or made known" to the expert at trial or, as in this case, at a competency hearing.

Dr. Huddleston's opinion regarding defendant's competency, insofar as it depended on the California records, was not based on "facts or data perceived by or personally made known" to Dr. Huddleston because her awareness of those facts or data was not attained through her own senses. Further, the phrase "at the hearing" refers to facts put in evidence. *State v. Strauch*, 239 Kan. 203, Syl. ¶ 4, 718 P.2d 613 (1986); *Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 546, 431 P.2d 518 (1967). In this case, defense counsel never offered the California records for admission under one of the exceptions to the hearsay rule, and those records were never admitted except as an appellate exhibit by the trial court. The letter from the custodian of the records was properly rejected by the trial court because neither the records nor the letter was properly authenticated. Because the California records were never admitted into evidence at the competency hearing, that portion of Dr. Huddleston's opinion which was based on the California records was not based on facts or data personally made known to the witness "at the hearing."

K.S.A. 60-456(b) differs from its federal counterpart, Rule 703 of the Federal Rules of Evidence. Rule 703 provides in part:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted."

As noted in 4 Vernon's Kansas C. Civ. Proc. § 60-456(b), Author's Comments (2005 Supp.): "The rationale of the Federal Rule is that judicial practice should be brought in line with the practice of experts themselves when not in court, who, in the case of physicians, may make life and death decisions on the basis of hearsay statements."

Under the federal rule, then, if it is the customary practice in the expert's specialty to consider reports from nontestifying third parties in formulating an opinion, the expert's testimony may be based on such reports. Under such circumstances, however, evidence of the report is not admitted as substantive proof of the report's truth but for the limited purpose of showing the basis of the expert's opinion. Consequently, upon request, the opposing party is entitled to a limiting instruction by the trial judge. See Imwinkelried, Evidentiary Foundations § 9.03(4)(c) (6th ed. 2005).

In contrast to the federal rule, Kansas has adopted the traditional approach to the question whether an expert may rely on reports from third parties, such as other experts, if the reports do not fall within any hearsay exception. Under the Kansas rule, experts' opinions based upon hearsay are not admissible in any court proceedings. See *In re Care & Treatment of Foster*, 280 Kan. 845, Syl. ¶ 9, 127 P.3d 277 (2006). Because the California records were not qualified and admitted under one of the exceptions to the hearsay rule, the records themselves remained inadmissible hearsay upon which Dr. Huddleston could not base her opinion that defendant was incompetent to stand trial.

As the State notes on appeal, the trial court largely based its ruling on *West v. Martin*, 11 Kan. App. 2d 55, and on *In re Watson*, 5 Kan. App. 2d 277. These opinions make reference to our decision in *Mesecher v. Cropp*, 213 Kan. 695, 518 P.2d 504 (1974).

In *Mesecher*, an automobile collision personal injury suit, defendant's expert, a neurosurgeon, had previously examined plaintiff Mesecher for signs of injury and found none. The neurosurgeon was not subpoenaed, did not testify, and was in California at the time of the trial. Prior to trial and at defense counsel's request, an unsolicited copy of the neurosurgeon's report was sent to the plaintiff's expert, Dr. Starkey. After Dr. Starkey had testified as to his

diagnosis, treatment, and prognosis for the plaintiff, the defense attorney on cross-examination obtained a copy of Dr. Starkey's file which contained the neurosurgeon's report. Over repeated hearsay objections, the defense was able to put all of the neurosurgeon's significant findings into evidence without any opportunity for plaintiff's attorney to cross-examine the absent neurosurgeon. 213 Kan. at 701.

On appeal, the defense attempted to justify the use of the report under K.S.A. 60-456(b)(1) which, as previously noted, allows an expert witness to give an opinion " 'based on facts or data perceived by or personally known or made known to the witness at the hearing.' " 213 Kan. at 701-02. The report did not contain facts or data perceived by or personally known to Dr. Starkey because he had not attained knowledge of those facts or data by means of his own senses. *Mesecher* observed that Dr. Starkey did not claim to base his opinion on the neurosurgeon's report, that the neurosurgeon's report was not "made known" to Dr. Starkey such that he could base his opinion on the facts therein because "made known" refers to facts put in evidence at the hearing. The facts and data contained in the absent neurosurgeon's report were not admitted into evidence. The court also commented that even hypothetical questions must be based on facts in evidence. *Mesecher* concluded that had the neurosurgeon's testimony as to his examination and findings been in evidence, his report embodying them would have been a proper tool for cross-examination. As it was, the procedure employed could only be described as "bootlegging" into evidence facts and data otherwise inadmissible. 213 Kan. at 702.

The decision in *Mesecher* turned on the inadmissibility of the neurosurgeon's report itself and whether cross-examination may be used as a device for placing before the jury facts not otherwise admissible. The court held that the neurosurgeon's report was hearsay and not admissible evidence unless it fell within one of the exceptions to the general hearsay rule, that an expert witness may not be cross-examined on facts which have no basis in evidence, and that cross-examination may not be used to place before the jury facts not otherwise admissible.

In *In re Watson*, 5 Kan. App. 2d 277, a severance of parental rights case, a clinical psychologist testified as an expert that the mother whose parental rights were in question was unable to change her present parenting abilities. The mother objected to this expert opinion testimony. The psychologist's testimony regarding the mother's past mental history was based on copies of psychological evaluation reports made by others over an earlier 10-year period. The expert's evaluation of the mother's present condition was based upon copies of reports of tests administered later by a Mr. Eyman and separately by the psychologist herself. Reports for the earlier tests were not offered into evidence. The psychologist's conclusion that the mother was unable to change her present parenting abilities was based on a comparison of present test results with the past reports of the earlier tests. 5 Kan. App. 2d at 277-78. Citing one of this court's earlier holdings, *Staudinger v. Sooner Pipe & Supply Corporation*, 208 Kan. 100, 105, 490 P.2d 619 (1971), the Court of Appeals noted that " '[t]he province of an expert witness is to aid a jury in the interpretation of technical facts or to assist in understanding the material in evidence and not to state simple conclusions based upon facts which could be, but which have not been placed in evidence.' " 5 Kan. App. 2d at 278.

The *In re Watson* court observed that the facts and data which were the basis for the psychologist's opinion were primarily test reports prepared by persons other than the psychologist; that the psychologist could not have made the comparison with the mother's past parenting abilities without the earlier reports; and that, therefore, the facts and data were not personally known to or perceived by the witness. The Court of Appeals held that the evidence of the prior evaluation reports and of the reports of the current tests that had been administered by Mr. Eyman were both hearsay and no attempt had been made to qualify the reports for admission under one of the exceptions to the hearsay rule. 5 Kan. App. 2d at 277-78.

Finally, *In re Watson* held that when expert opinion or inference testimony, such as the psychologist's testimony in this case, is based on inadmissible hearsay, it does not meet the requirements of K.S.A. 60-456(b). Thus, the psychologist's opinion evidence based

on the reports of others was deemed inadmissible. 5 Kan. App. 2d at 277-80. "[A]n expert must base his [or her] testimony upon facts personally perceived by or known to him [or her] or made known to him [or her] at the hearing." 5 Kan. App. 2d at 278. Under the facts of *Watson*, the court found 60-456(b) proscribed the use of the prior opinions by the testifying psychologist because such opinions were not perceived by or made known to the psychologist. 5 Kan. App. 2d at 278.

*West*, 11 Kan. App. 2d 55, a personal injury case, involved the admissibility of computer-evaluated test material. After conducting a physical exam and diagnostic tests on plaintiff, an orthopedic surgeon employed by defendant administered a psychological exam to the plaintiff which was sent off to be scored and interpreted by a computer. The test report, in the form of a computer printout, consisted of several pages, one of which contained an evaluation, analysis, or interpretation of the plaintiff's profile. The defense sought to admit this printout into evidence through the orthopedic surgeon. The trial judge overruled plaintiff's objection based on hearsay and lack of proper foundation grounds, noting the printout was not merely a compilation of data supplied by plaintiff but was an analysis of answers or an interpretative summary made by the computer. 11 Kan. App. 2d at 59-60.

The testifying expert did not score the tests he administered but mailed the completed tests to a testing service company, where plaintiff's responses were evaluated and interpreted by a computer. The Court of Appeals further noted that the printout was not a writing made in the regular course of the orthopedic surgeon's business and, therefore, did not qualify as an exception to the hearsay rule under the business records exception, K.S.A. 60-460(m) (Weeks 1976). The Court of Appeals ruled that the printout was inadmissible as hearsay evidence, and that the orthopedic surgeon's opinion testimony based on the printout was inadmissible and contrary to K.S.A. 60-456(b) in that the printout was not based on information perceived by or personally known or made known to the expert. 11 Kan. App. 2d at 59-61.

Defendant argues that *State v. Kaiser*, 260 Kan. 235, 918 P.2d 629 (1996), provides a basis for the admission of Dr. Huddleston's

opinion, even though it was based upon the California records. Defendant also argues that *Mesecher*, and by implication, *West*, were greatly limited by this court's decision in *City of Wichita v. Eisenring*, 269 Kan. 767, 7 P.3d 1248 (2000).

*Kaiser* was a direct appeal in a criminal case. Kaiser claimed that the trial court erred by permitting a medical expert to rely on hearsay evidence in the form of past reports from other experts. Based upon the expert's testimony, the trial court waived juvenile jurisdiction and certified Kaiser for prosecution as an adult. 260 Kan. at 258. Kaiser challenged the testimony of his primary social worker, the testimony of the program director at the Youth Center of Topeka, and the testimony of Dr. Logan, who had conducted a psychological evaluation of Kaiser for the certification hearing.

Under applicable law at the time of Kaiser's certification hearing, K.S.A. 38-1636(e) (Furse 1993) provided that "[s]ubject to the provisions of K.S.A. 38-1653, . . . written reports and other materials relating to the respondent's mental, physical, educational and social history may be considered by the court" in determining whether or not prosecution as an adult should be authorized. K.S.A. 38-1653 (Furse 1993) provided that in all adjudicatory hearings under the Juvenile Justice Code, "the rules of evidence of the code of civil procedure shall apply. The judge presiding at the hearing shall not consider, read or rely upon any report not properly admitted according to the rules of evidence."

Dr. Logan testified that he evaluated Kaiser and, in reaching his conclusions, he relied on statements Kaiser made to him when interviewed and on psychological reports and other records completed at Kaiser's various placements. Logan also considered police reports concerning Kaiser's current offenses and testified as to events Kaiser self-reported. He testified that the reports reviewed generally confirmed defendant's self-report, with the additional information of an incident of sexual abuse. He also testified as to the results of psychological testing conducted by various agencies regarding Kaiser's placements and the recommendations which led to those placements.

Kaiser argued that Dr. Logan's opinion was based on past reports and not on facts personally perceived. Although Kaiser admitted

that some of Dr. Logan's information came from Kaiser himself, Kaiser asserted that much of Dr. Logan's evaluation was based on the past reports Logan considered. Kaiser pointed to K.S.A. 60-458 and, after acknowledging that under the rules of evidence an expert witness is allowed to state an opinion and the reasons therefore without first specifying the data upon which the opinion is based, noted that upon cross-examination the witness may be required to specify such data.

In resolving the challenge to Dr. Logan's testimony, the court pointed to K.S.A. 60-458 (an expert witness may state an opinion and the reasons therefor without first specifying the data upon which the opinion is based, but upon cross-examination the witness may be required to specify such data) and stated:

"Dr. Logan adequately specified the data upon which his evaluation was based. *His reliance on information prepared by other sources was appropriate.* When an expert witness is required to specify the data upon which the expert opinion is based, and that data includes statements made by a criminal defendant during a psychiatric evaluation, the defendant's statements are not offered to prove the truth of the matter asserted and thus are not hearsay. Rather, the defendant's statements are part of the data perceived by or made known to the expert and meet the admissibility requirements of K.S.A. 60-456(b). *State v. Humphrey,* 252 Kan. 6, Syl. ¶ 5, 845 P.2d 592 (1992). *The same is true for data obtained from other sources. The reports upon which Dr. Logan's expert opinion was based were not offered into evidence and were not inadmissible hearsay.*" (Emphasis added.) 260 Kan. at 260.

The court therefore held Dr. Logan's expert testimony was admissible. 260 Kan. at 260.

Other than stated above, there is no additional explanation for the court's ruling in *Kaiser* that Dr. Logan's reliance on the data/information/reports obtained from other sources was appropriate. The resolution of the issue by stating there was compliance with 60-458, with no attempt to reconcile that statute with the requirements of 60-456(b), is puzzling and renders K.S.A. 60-456(b) meaningless or, at least, relegates it to the status of an evidentiary rule that is merely surplusage. An expert's reliance for his or her testimonial opinion based upon "information prepared by other sources" and "data obtained from other sources" constitutes an

opinion based upon hearsay and is inadmissible under the provisions of K.S.A. 60-456(b).

In *State v. Brooks*, 217 Kan. 485, Syl. ¶ 1, 536 P.2d 1365 (1975), this court stated that when K.S.A. 60-456(b) is read in conjunction with K.S.A. 60-458, an expert witness may state his or her opinion without first specifying the data on which the opinion is based when within the scope of the expert's special knowledge, skill, experience, or training, *and* when based on facts or data perceived by or personally known or made known to the expert at the hearing.

*Kaiser* cites *Humphrey*, 252 Kan. 6, for its authority that Dr. Logan's expert testimony was admissible, but the opinion offers no assistance in explaining how the *Kaiser* court arrived at its decision where Dr. Logan relied upon information from other sources. In *Humphrey*, defendant's competence to stand trial as well as his sanity on the date of the alleged crimes had been brought into issue. A psychiatrist from the Menninger Clinic, Dr. Herbert Modlin, interviewed Humphrey and prepared a report that indicated it was possible the homicide Humphrey was charged with was accidental. Humphrey noted that after Dr. Modlin completed his report, "he was provided with transcripts of the preliminary hearings as well as the deposition of Tony Gray and a statement made by Tina Gray." 252 Kan. at 13. Humphrey attempted to call Dr. Modlin as a witness in his case in chief, but the trial court ruled that if Dr. Modlin was called and testified as to the contents of his report, Humphrey would have to be available for cross-examination on whatever Humphrey had told Dr. Modlin which assisted Modlin in arriving at his expert opinion. 252 Kan. at 12-13.

On appeal, this court ruled that the statements Humphrey made to Modlin during Modlin's examination of him would not have been hearsay had Modlin repeated Humphrey's statements at trial:

"Modlin's testimony as to Humphrey's statements during trial would not be offered to prove the truth of the matter stated. Instead, Humphrey's statements would be offered to establish the basis of Modlin's expert opinion. Dr. Modlin, as a trained psychiatrist, could use Humphrey's statements *with other facts* and his own expertise to arrive at an opinion of Humphrey's mental state at the time the shooting occurred." (Emphasis added.) 252 Kan. at 14.

The court then observed that Humphrey's statements were part of the data perceived or made known to Dr. Modlin and that the

statements meet the requirements of K.S.A. 60-456(b). The court further commented that its decision was supported by *United States v. Baird*, 414 F.2d 700 (2d Cir. 1969), *cert. denied* 396 U.S. 1005 (1970); however, the portion of the *Baird* opinion quoted by the court concerns only the admissibility of statements a defendant makes to a psychiatrist. It does not address any *other facts* acquired by the psychiatrist. 252 Kan. at 15.

The *Humphrey* court's opinion does not disclose what "other facts" the court referred to. "Other facts" does not refer to the transcript of the preliminary hearing, the deposition of Tony Gray, or the statement of Tina Gray, as those came to Dr. Modlin after he had completed his report and arrived at his opinion that " '[t]he data support Mr. H's contention that the shooting was accidental.' " 252 Kan. at 13. While not expressed in the opinion, the "other facts" most probably were the common mental and emotional consequences resulting to Humphrey from sleep deprivation of 100 hours or more. See 252 Kan. at 13. The nature of these "other facts" (*i.e.*, the expert's general medical/psychological/psychiatric knowledge regarding the consequences of excessive sleep deprivation) is entirely different from the nature of the reports approved in *Kaiser* (information specifically related to a particular defendant such as the psychological and other records completed on Kaiser at Kaiser's various placements; police reports concerning Kaiser's current offenses; reports of results of psychological testing on Kaiser conducted by various agencies; and information on Kaiser's placements and the recommendations which led to those placements). *Humphrey* provides no support for *Kaiser's* decision that Dr. Logan's testimony relying on the data/information/ reports obtained from other sources was admissible.

The admission of Dr. Logan's opinion based upon other information and reports not in evidence violates the provisions of K.S.A. 60-456(b). Whether additional facts not disclosed in the opinion may account for the court's decision in *Kaiser* is not known. On the facts given, we must disapprove of the *Kaiser* opinion in its holding that past reports and information concerning the defendant, not admitted in evidence, may be considered by a testifying

expert in rendering his or her opinion at trial. The opposite is true. We therefore reject this holding in *Kaiser*.

*City of Wichita v. Eisenring*, 269 Kan. 767, an eminent domain case, does not support defendant's position in this appeal. In *Eisenring*, we noted that eminent domain is not a civil action; rather, it is a creature of statute. The major issue in a condemnation action is the condemned property's fair market value, and any competent evidence bearing on that issue is admissible. Considerable discretion is vested in the trial court in admitting or rejecting evidence of fair market value, and the latitude accorded the parties in bringing out collateral and cumulative facts to support value estimates is left largely to the discretion of the trial court. Evidence consists mostly of opinions of witnesses who are sufficiently well informed on the subject to be helpful and informative to the jury, and such evidence is allowed because the valuation of real estate is largely a subjective matter and cannot be definitely determined by the application of any exact principle of science. We noted the rule in Kansas with regard to eminent domain proceedings is that once a witness has qualified as an expert land appraisal witness in a condemnation action, the court cannot regulate the factors he or she uses or the mental processes by which the witness arrives at his or her conclusion. These matters can only be challenged by cross-examination, testing the witness' credibility. Thus, contrary to defendant's assertion, *Eisenring* provides no support for *Kaiser*'s holding that Dr. Logan's opinion based on other expert opinions not admitted at trial is appropriate.

We conclude that the defendant's California medical records were not properly authenticated, were not offered as an exception to the hearsay rule, and remained inadmissible hearsay. Defendant did not meet his burden of establishing that the trial court abused its discretion in excluding the testimony of Dr. Huddleston based on the California records. Accordingly, we hold the trial court did not abuse its discretion in excluding the testimony of Dr. Huddleston in question when ruling on defendant's competence to stand trial in this case.

## (2) The Admission of Defendant's Unredacted Videotaped Interview

Defendant filed a motion in limine seeking to excise certain portions of the videotaped interview of defendant by Detective Hagenson. The defense generally wanted to keep the jury from hearing defendant's statements about the crimes for which he had been arrested in California, including, among other statements, those related to his being chased by the police the previous day; his recent drug use; his possession of a stolen weapon; previous legal action against him in the Liberal shooting; his use of a false name; his burglary and automobile burglary experience; other shootings by him; and his armed robbery. A hearing was held on the motion prior to trial. Unfortunately, an official transcript of the proceedings is unavailable. In lieu of a transcript, the parties agreed upon a statement of the proceedings, which was approved by the trial court pursuant to Supreme Court Rule 3.04 (2005 Kan. Ct. R. Annot. 25).

According to the statement of proceedings, the defense argued "that the evidence of other crimes had no probative value [and] was extremely prejudicial." In response, "[t]he State argued that the tape was admissible under a res gestae analysis, that the videotape was 'all one piece of evidence,' and that breaking it up would lead to juror confusion." The defense responded that "because of the length of time of the segments where [defendant] was confessing to the shootings in Kansas, a redacted tape would be choppy, but easy to follow nonetheless." The State argued that "the entire tape should be shown . . . to explain the context of the interview," and that "a limiting instruction could be given."

In its denial, the trial court ruled that "redaction would 'break up the flow' and interfere with the State's right to properly present its evidence," and "further found that this entire tape [was] part of res gestae." At trial, the court gave the jurors a limiting instruction prior to their deliberation to the effect that evidence of prior crimes should not be considered to establish a propensity for criminal activity in regard to the present case.

In his motion for new trial, the defendant argued that evidence of far too many and too serious crimes were admitted to be cured

by a limiting instruction to the jury. The defense further argued that the State agreed that on its face the substance of the tape was neither "res gestae nor probative." The trial judge again rejected defendant's argument, saying that he had seen the videotape three times:

"In this particular case, because of the complexity of that interview, had you eliminated from the tape all of the discussion about anything except this crime . . . , it was the Court's opinion the tape made no sense. It didn't flow; you couldn't figure out where the questions were coming from, and it made it almost impossible for a listener to accurately judge the quality of the information being received. And that is the reason that I gave the limiting instruction and allowed the entire tape to be admitted."

On appeal, defendant argues: (1) that prior crimes and civil wrongs evidence must generally be analyzed under 60-455 to be admissible, that this analysis was not performed, and that the probative value of the evidence is outweighed by the unfair prejudice to defendant; and (2) that the evidence is not admissible under any of the exceptions to the general rule, including, among others, admissibility as part of the res gestae of the crime.

We agree with the defendant on both points.

K.S.A. 60-455 allows prior crimes and civil wrongs evidence "when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Nothing in the record, however, indicates that the State attempted to admit the videotape under a 60-455 analysis; rather, it suggests the contrary. Even if the State had made such an attempt, the record provides no support for the admission of the defendant's prior crimes and civil wrongs for any of the reasons set forth in K.S.A. 60-455. Moreover, this court no longer recognizes res gestae as an independent basis for admissibility. See *State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006). As such, the trial court's admission of the evidence on this ground constituted an abuse of discretion.

The trial court determined that the entire videotape was admissible because if redacted to exclude the defendant's prior crimes and civil wrongs, the statement would not make sense or would become confusing to the jury. Nothing in Kansas law provides sup-

port for the trial court's admission. In *State v. Rakestraw*, 255 Kan. 35, 44-45, 871 P.2d 1274 (1994), we reversed defendant's conviction based upon the admission of a redacted statement of the defendant because "the meaning of [the] statement was substantially changed [and distorted] by the process of redaction." We concluded that the statement had been "distorted" by the process of redaction, and that Rakestraw had been denied a fair trial. 255 Kan. at 45.

Distortion was not a question in the case we now consider. The videotape of the defendant is extraordinarily probative in that it contains defendant's confession in detail of the crimes charged. However, the videotape also contains defendant's confession to a host of other unrelated crimes. Nowhere in the record, nor anywhere in the appellate briefs, is a reason provided for admission of unrelated crimes except the trial court's ruling that the videotape would lose all sense of context and become confusing if redacted.

An examination of the videotape reveals that the trial court's concern may be valid because the interviewing officer often jumps from questions about the Liberal shootings to other California crimes without warning, sometimes asking general questions and sometimes inquiring about specific details. However, this problem is overstated. There are long stretches where a series of questions are asked about one crime or another, but it cannot be said that no reasonable method of redaction was available to alleviate confusion. Thus, the reason given by the trial court in the face of the prejudice to defendant fails to support the admission of the entire videotape. Moreover, the trial court's error was not cured by the limiting instruction given, even though we must presume that the jury followed the court's instruction. There was simply no basis for the admission of the entire videotape.

In *State v. Hebert*, 277 Kan. 61, after determining the trial court had erred in several instances by the admission of prior crimes and civil wrongs, this court considered whether the admission of the evidence was harmless, or whether it may have been so prejudicial as to have changed the result of the trial and denied the defendant a fair trial. In its evaluation, *Hebert* addressed whether the admission of the evidence (1) was inconsistent with substantial justice;

(2) affected the substantial rights of defendant; and (3) had any likelihood of changing the results at trial. 277 Kan. at 94.

The jury viewed the videotape, in which the defendant, in his own words, described in great detail how he shot two people, killing one—the subject of the charges in this case. This evidence was introduced by the interviewing officer, who was available for clarification on direct questioning and cross-examination. Defendant's story was corroborated by numerous independent witnesses and exhibits. The weight of the evidence against defendant is overwhelming.

In addition, the argument that the jury might infer a propensity to commit criminal acts from the evidence of the other crimes is particularly weak considering defendant at trial did not argue that he had not committed the crime. Rather, he defended himself on a self-defense theory. Because defendant's conviction did not turn on whether or not he committed the prior acts, and because of the overwhelming evidence of his guilt, it cannot be said that the admission of the unredacted tape was inconsistent with substantial justice, affected the substantial rights of defendant, or had any likelihood of changing the results at trial. While not curing the error of admission, the trial court's limiting instruction had the effect of lessening the prejudicial effect of the erroneously admitted evidence.

### (3) The Admission of Defendant's Confession

"In reviewing a trial court's decision regarding the suppression of a confession, an appellate court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard." *State v. Swanigan*, 279 Kan. 18, Syl. ¶ 1, 106 P.3d 39 (2005). Substantial competent evidence is that legal and relevant evidence that a reasonable person might accept as being sufficient to support a conclusion. *State v. White*, 275 Kan. 580, 596, 67 P.3d 138 (2003).

Defendant filed a pretrial motion seeking to suppress statements made by defendant to law enforcement officers. The only such statements offered at trial involved Detective Hagenson's videotaped interview with defendant. At the pretrial hearing to discuss

this motion, Hagenson stated that his first contact with defendant occurred after his arrest for robbery. At this point, defendant had been sitting alone in handcuffs in the interrogation room for approximately 45 minutes. Hagenson, after a few preliminary questions regarding defendant's name and age, read defendant his *Miranda* rights. As he began to do so, defendant interrupted Hagenson to state that he wanted to talk; Hagenson reread defendant his rights from the beginning and made sure that defendant understood them before proceeding further.

Hagenson testified that defendant was responsive to his questioning and that defendant had no difficulty in following the questions he was asking. He further stated that defendant displayed no outward signs that he needed medical attention, nor did he request any medical or psychological attention. However, there were some signs that defendant may have been in somewhat of a confused mental state. Defendant seemed uncertain as to whether his date of birth was 1979, 1980, or 1981 and did not seem to know his address.

At one point, defendant noted that he had not slept for 2 days. Hagenson also testified that defendant had said he was "strung out" on marijuana. It should be noted that this statement did not occur until well into the interview; Hagenson testified at the preliminary hearing that he had not asked about drug use initially because, based on his previous experience as a narcotics officer, defendant did not appear to be under the influence of anything. Defendant also made several odd statements: he said he was "going back to hell," which Hagenson took to be a reference to prison, and that his "brains were messed up."

The interview lasted from 2 to 3 hours. Several times during the interview Hagenson asked defendant, " 'What's the matter?' " Hagenson stated that this was not out of concern for defendant's physical well being, but merely because defendant seemed angry or upset at him. Hagenson seemed to go out of his way to make defendant comfortable, at various points getting him a blanket and some water, and removing defendant's handcuffs.

At no time did defendant request an attorney. At no time did he specifically ask for the questioning to stop. At one point, defendant

said he just wanted to go back to the main prison and sleep. Hagenson took this to mean defendant wanted to sleep after the interview was finished and continued the interview, with no objection from defendant.

At the pretrial hearing, defendant argued that the motion should be suppressed because defendant was in handcuffs for an hour; because of defendant's confusion; because he was "strung out on drugs"; and because at one point he had indicated his desire to return to jail and go to sleep.

In denying the motion to suppress, the trial judge relied primarily on the videotape, which the trial judge had viewed twice before ruling. He noted that the *Miranda* warnings were properly given, and even complimented Hagenson on how well he had conducted the interview. He noted that Hagenson had not "abused or pressured" defendant and had gone out of his way to make defendant comfortable. The trial judge concluded that "[t]here was nothing out of the ordinary or nothing improper about the interview process."

After defendant's conviction, in denying the defense's motion for a new trial, the trial court reiterated its rationale for finding the confession to be voluntary. The trial court here additionally noted that Hagenson had specifically told defendant "all you're doing is . . . helping me," that Hagenson had specifically told defendant that he would not or could not make him any promises in exchange for his cooperation, and that the trial judge did not "know how [Hagenson] could have been any more straightforward . . . or any more fair with [defendant]."

Defendant on appeal argues that the trial court erred in refusing to suppress the videotaped statements as involuntarily given. Specifically, he argues that his mental condition was such that he could not have voluntarily waived his *Miranda* rights, pointing to his confusion about his birth date and his address; his sleep deprivation; and his drug use. He argues that the length of the interview exacerbated this fragile mental condition and that Hagenson's interview tactics were unfair. Specifically, defendant argues that Hagenson should have known from defendant's comment that he wanted to return to the jail and sleep and no longer wanted to talk.

Hagenson's asking, " 'What's the matter?' " indicated that Hagenson knew something was wrong with defendant. Finally, the defense argues that, despite the fact he was 18 at the time of the interview, he was still a teenager, and that his age should be taken into account.

In determining whether a confession is voluntary, a court is to look at the totality of the circumstances. The burden of proving that a confession or admission is admissible is on the prosecution, and the required proof is by a preponderance of the evidence. The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused. *Swanigan*, 279 Kan. at 23-24.

"Factors to be considered in determining whether a confession is voluntary include: (1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect, and background; and (5) the fairness of the officers in conducting the investigation. [Citation omitted.]" *Hebert*, 277 Kan. at 76.

### Mental Condition

Defendant argues that his mental condition was such, due to his marijuana use, sleep deprivation, and general confusion about basic personal information, that he could not have voluntarily waived his *Miranda* rights. Defendant offers no examples of cases where such factors have been used to find a confession involuntary.

In *State v. Young*, 220 Kan. 541, 552 P.2d 905 (1976), Young argued that a statement given to police at the time of his arrest should be suppressed as involuntary, as he was under the influence of marijuana as well as other drugs. The officers testified at trial that they smelled the odor of marijuana on Young and that his eyes were red. However, officers also testified that Young did not seem out of touch with reality, his speech and mentality did not appear to be impaired, and he seemed to have command of his faculties. The court held that Young's drug use did not preclude a finding of voluntariness. 220 Kan. at 547-48.

Similarly, in *State v. Bell*, 276 Kan. 785, 80 P.3d 367 (2003), Bell testified that he had smoked marijuana approximately an hour before making his statement to police. In upholding the trial court's

voluntariness ruling, the court noted that a videotape of the interview supported the officer's testimony that Bell did not appear to be under the influence of any drugs, as his speech was "clear and coherent," and he "actively engaged in conversation with the officers." 276 Kan. at 797.

In the present case, the interviewing officer, formerly assigned to investigate narcotics violations, testified that defendant did not appear to be under the influence of drugs, and that defendant was responsive to his questioning and did not appear to have trouble following his questioning. The videotape corroborates this assessment. Other than the aforementioned confusion over his birthdate and address, defendant articulated a clear, detailed recollection of the Liberal shooting. Additionally, defendant's mention of marijuana use is a single, isolated one, which does not specifically state when exactly he used the drug (as opposed to Bell, who had testified that he had used the drug only 1 hour before the interview).

A similar analysis applies to the contention that defendant was not in an appropriate mental state to waive his rights due to his lack of sleep. In *State v. Ramos*, 271 Kan. 520, 525, 527, 24 P.3d 95 (2001), Ramos had been "up all night," and although he seemed tired, "he did not have slurred speech, his statements were coherent, and he was not repetitive"; even though a minor, Ramos' confession was deemed voluntary. In the instant case the videotape, again, corroborates the interviewing officer's testimony that defendant was able to understand and respond to the questions.

Further, while mental condition is a factor "to be considered in determining the voluntariness of a statement, 'a defendant's mental condition, by itself and apart from its relation to official coercion, should never dispose of the inquiry into constitutional voluntariness.' . . . '[T]here must be a link between coercive activity of the State and the confession. [Citation omitted.]' " *State v. Mays*, 277 Kan. 359, 376, 85 P.3d 1208 (2004). Even if defendant was in a particularly fragile or suggestive mental state at the time of the interview, there is no indication that Hagenson took advantage of this to coerce a confession. Defendant was more than willing to volunteer information, even before he had finished hearing his rights. Hagenson had no idea Gonzalez was a suspect in a murder

before Gonzalez volunteered the information. The information had been volunteered even before Gonzalez mentioned his drug use or lack of sleep. The trial judge noted this and even complimented Hagenson on the fairness of the interview.

### Manner and Duration of Interrogation

Defendant contends that the 2- to 3-hour length of the interview, coupled with the 45-minute wait before the interview began, is another factor that should be considered in finding that the videotaped statements were involuntarily given.

In *State v. Grissom*, 251 Kan. 851, 919-20, 840 P.2d 1142 (1992), Grissom was subjected to a nearly 8-hour interrogation, punctuated by restroom and meal breaks, and was handcuffed throughout. Similarly, in *State v. William*, 248 Kan. 389, 409-10, 807 P.2d 1292, *cert. denied* 502 U.S. 837 (1991), defendant was interrogated for approximately 6 hours over a 19-hour period. In neither case did the length of the interrogation cause the appellate court to disturb the trial court's finding of voluntariness. In comparison, defendant's interview in the present case was of a much shorter duration, and an examination of the videotapes reveals that throughout much of the time defendant was held in the interrogation room, he was not being actively interviewed.

### Ability to Communicate With Outside World

There is no indication that defendant ever made any request to communicate with the outside world during the interview, and no such argument is made on appeal.

### Age, Intellect, and Background

Defendant argues that his age (18) should be a factor in the voluntariness determination, given that, although he was technically not a minor at the time of the interview, he was still a teenager. Kansas courts have used a special test for the voluntary nature of statements made by a minor since *Young*; however, even *Young* noted that "[c]ases holding admissible the confession of a sixteen-year-old appellant where the confession was freely and voluntarily given are numerous. [Citations omitted.]" 220 Kan. at 546. More recently, *Bell*, while noting that the minority of a defendant man-

dates special considerations in determining voluntariness, held the confession of a 16-year-old of average intelligence to be voluntary under the totality of the circumstances. 276 Kan. at 799.

Perhaps more important in the instant case is the fact that Kansas courts have never held that nonminors should be treated differently than minors in a voluntariness analysis. Here, defendant was 18; no evidence is offered that defendant, for whatever reason, functioned mentally as younger than his actual age.

### *Fairness of Officer's Conduct*

Defendant argues that Hagenson's conduct in the interview was unfair; specifically, that when defendant said he was tired and wished to return to the main jail to sleep, Hagenson should have interpreted the statement as a desire to end the interview. "When a suspect makes a statement which might be ambiguous as to whether the suspect is asserting a right to remain silent or to confer with counsel, the interrogator may ask questions to clarify, but the interrogator is not required to clarify and may continue the questioning. [Citation omitted.]" *State v. Holmes*, 278 Kan. 603, 618, 102 P.3d 406 (2004).

In the present case, the interrogator, Hagenson, did in fact ask a clarifying question: he asked whether defendant meant he wished to return after the questioning was completed. Though it is unclear from the videotape what exactly defendant's response to this question was, defendant continued to answer Hagenson's questions for at least another hour without protest or complaint. Further, on review of the videotape, the trial judge found no evidence that Hagenson had acted unfairly during the course of the interview.

We conclude, after reviewing the factual underpinnings of the trial court's decision, that those factual underpinnings are supported by substantial competent evidence. The decision to admit the defendant's confession based on our legal de novo review was correct.

### (4) **Failure to Instruct on Defendant's Theory of Self-Defense**

"In a criminal action, the district court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. When

considering the district court's refusal to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction. A defendant is entitled to an instruction on his or her theory of the case even though the evidence thereon is slight and supported only by the defendant's own testimony. [Citation omitted.]" *Bell*, 276 Kan. at 792.

At trial, defendant attempted to defend himself based on a theory of self-defense. Specifically, Gonzalez argued that one of the victims, Lozoya, had threatened him with a gun in the past; that he had been the victim of drive-by shootings in the past, which he blamed on Lozoya; and that, on the night of the shooting, Lozoya's actions in turning off the lights and driving slowly through the alley, coupled with a belief that Lozoya was armed, led defendant to believe he needed to defend himself through forceful means.

Jorge Soto testified at trial that defendant had lived with him and his family in Liberal in 1997, prior to the shootings. Two or three times between May and July 1997, the Soto household had been victims of drive-by shootings, resulting in property damage but no injury. These shootings had forced the Soto family to move from Liberal to Hugoton prior to the shootings in the present case. Soto testified that defendant had gone into Liberal on the night of the shootings to look for Max Romero, whom he blamed for these drive-by shootings. Instead, he found the car containing victims Lozoya and Heathman.

Additionally, at trial defendant had argued that defendant had specific reasons to fear Lozoya. Soto testified that defendant had told him he had "stuck [Lozoya] up, took his cell phone from him. . . . And then [Lozoya] said, I'll come back with my gun."

Whether or not defendant knew the identity of the victims at the time he began shooting was the subject of some debate at trial. On direct examination, Soto first testified that defendant had said he did not know who was in the car at the time of the shooting, but that he merely believed they were rival gang members. On cross-examination, however, Soto stated that although defendant did not know the names of the vehicle's passengers, he "probably" recognized at least one of them, as defendant had previously robbed Lozoya with a knife. Additionally, Heathman, the passenger, had testified that he had been in a car with defendant on a

previous occasion. Soto did not testify that defendant specifically suspected the victims of involvement in the earlier drive-by shootings.

During the videotaped interview, over 2 years later, defendant told Hagenson that he knew one of the vehicle's passengers, as he had previously stated he was going to kill defendant. When asked if he was sorry for the shooting, defendant replied that they deserved it, as they were responsible for shooting at defendant's house. When asked why he shot the men, defendant said it was "payback" for drive-by shootings at defendant's house. During the interview, defendant did not mention self-defense.

At trial, defendant placed great emphasis on the actions of the victims, arguing that he knew the car, knew the passengers, one of whom had previously threatened him, that the passengers had thrown gang signs at him, and that the car turning around, driving through an alley, slowing down, and turning its lights off were construed as threatening by defendant. Soto testified that defendant saw one of the passengers reach down, and that defendant said he "didn't know if they had something."

The prosecution, on the other hand, placed emphasis on evidence that showed defendant had approached the car from behind. Officer Schafer, who witnessed the event, had testified as much. Additionally, forensic evidence indicated that at least one of the shots had been fired from behind. Several of the State's exhibits were photographs taken at the crime scene and which Patsy Guinn, crime scene technician for the Liberal Police Department, testified indicated the "directionality" the bullets were traveling. The defense objected neither to the admission of the photographs, nor to the trial judge's characterization of the physical evidence, either contemporaneously or during posttrial hearings.

At trial, the State objected to a jury instruction proposed by the defense that would have read:

"The defendant has claimed his conduct was justified as self-defense. A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself against such aggressor's imminent use of unlawful force. Such justification re-

quires both a belief on the part of defendant and the existence of facts that would persuade a reasonable person to that belief."

The State argued that, while there may be a "scintilla of evidence that defendant somehow in his mind thought he had to act in self-defense," no evidence had been introduced to show that any reasonable person would have shot the victims under the same circumstances. The defense responded that evidence had been admitted to show that defendant had been a victim of a drive-by shooting and that Lozoya had threatened defendant in the past. The trial court agreed with the State and declined to give the requested self-defense instruction, noting especially Officer Schafer's testimony and the forensic evidence that defendant had approached the vehicle and fired from behind. While the trial court had little difficulty in giving an instruction on lesser-included voluntary manslaughter over the State's objection, as some evidence had been admitted tending to show defendant might have believed his life was in danger, it concluded that "[h]e clearly had the ability to let them drive on down the alley with their lights off and hauled the other way."

In the motion for a new trial, defendant again objected to the failure to give the self-defense instruction. The trial court responded that, since the voluntary manslaughter instruction required jurors to undertake a similar analysis but with a less stringent standard than the self-defense instruction, and since the jury rejected the voluntary manslaughter argument, it would be "absurd" to think that had the instruction been given, the jury would have acquitted defendant on self-defense grounds.

On appeal, defendant argues that evidence was admitted that he believed his life was in danger, pointing specifically to the earlier drive-by shootings at the Soto house and the menacing actions of the victims on the night of the shooting, and that defendant's actions were reasonably necessary to defend himself against the imminent use of unlawful force. The State argues that there is no evidence to link the victims to the drive-by shootings, that the trial court gave the requested voluntary manslaughter instruction, and that there was no evidence admitted indicating that a reasonable

person needed to hide in an alley and shoot into the victim's car from behind.

In *Bell*, 276 Kan. at 793, this court addressed the question raised by this appeal:

"The provisions of K.S.A. 21-3211 limit the use of force against an aggressor to those circumstances when and to the extent 'it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force.' Thus, before a defendant is entitled to a self-defense instruction, relevant evidence must establish that (1) the defendant honestly and sincerely believed it would be necessary to kill in self-defense, and (2) a reasonable person would have perceived the necessity of self-defense."

"K.S.A. 21-3403 defines voluntary manslaughter as 'the intentional killing of a human being committed . . . (b) upon an unreasonable but honest belief that circumstances existed that justified deadly force under K.S.A. 21-3211 . . . .' The circumstances described in K.S.A. 21-3211 are restricted to a defendant's 'use of force against an aggressor when . . . such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force.'" *State v. Hunt*, 270 Kan. 203, 209, 14 P.3d 430 (2000).

A jury instruction on voluntary manslaughter requires an accused to show by some evidence that he or she had an honest belief that the actions were necessary to defend himself or herself against such aggressor's imminent use of unlawful force. An accused need not demonstrate that a reasonable person under the same circumstances would believe that the action of shooting the victims was necessary to defend himself or herself against an aggressor's imminent use of unlawful force. Thus, involuntary manslaughter requires only a subjective belief, while self-defense requires a subjective belief, as well as a reasonable belief.

Defendant introduced evidence that he had been the victim of several drive-by shootings in the months leading up to the events of the present case. There is some evidence, contrary to the State's contention, that defendant felt that the victims were connected to these earlier shootings, particularly his statement in the videotaped interview that he shot the victims as payback for their involvement in these shootings. Lozoya had previously threatened defendant with gun violence. He felt threatened both by Lozoya's driving the Lincoln through the alley without headlights and by the Lincoln's

passenger, whom he recognized, bending down for something. Despite the fact that defendant claimed during the videotaped interview several times that he shot the victims for revenge, not for self-defense, some amount of evidence supporting defendant's honest belief that he was in danger was presented, and the jury deserved the opportunity to pass judgment on its weight and credibility. As the court properly found, defendant was entitled to the voluntary manslaughter instruction, as the evidence, viewed in the light most favorable to defendant, establishes to some extent defendant's honest and sincere belief that his actions were necessary to defend himself.

This voluntary manslaughter analysis is identical to the first, subjective prong required to justify a self-defense instruction. The trial court, however, found that defendant did not meet the second requirement—that a reasonable person would also have perceived the need for the use of force in self-defense. The trial court found that there was no evidence that a reasonable person would have used force under those circumstances. It based its decision primarily on evidence that defendant had already been passed by the Lincoln, approached it from behind, and then began shooting, when by all indications he might simply have turned and walked away. Defendant has presented no evidence at trial or on appeal to specifically refute this point.

Research reveals no Kansas court cases where a trial court has found that some evidence exists to satisfy the subjective prong, thus justifying a voluntary manslaughter instruction, but no evidence exists that the objective, "reasonable" belief prong has been satisfied. In previous cases denying a defendant's request for a self-defense instruction, the typical stumbling block has been a lack of evidence to show that defendant held a subjective belief in the necessity of self-defense, thus obviating the need to reach the objective prong. See, e.g., State v. Sims, 262 Kan. 165, 172-73, 936 P.2d 779 (1997) (subjective prong of self-defense test not met where defendant claims at trial that he or she had no part whatsoever in the shooting); State v. Barnes, 263 Kan. 249, 265-66, 948 P.2d 627 (1997) (subjective prong of self-defense test not met where evidence indicates defendant either initiated or willingly

participated in mutual combat). In only one case, *State v. Childers*, 222 Kan. 32, 563 P.2d 999 (1977), has the reasonable belief requirement been explored in any sort of depth. The *Childers* court held that a self-defense instruction request requires the defendant to show "a belief that the force used was necessary to defend himself and . . . [to] *show the existence of some facts that would support such belief.*" (Emphasis added.) 222 Kan. at 48.

The Tenth Circuit, however, has on at least one occasion had to interpret what a "reasonable belief" entails as regards the second, objective prong in the Kansas self-defense test. See *Tyler v. Nelson*, 163 F.3d 1222 (10th Cir. 1999). The *Tyler* court first noted Kansas Supreme Court holdings that any amount of evidence is enough to warrant a requested instruction and that a self-defense instruction can be supported by defendant's testimony alone. However, in light of the *Childers* implication that additional facts outside defendant's testimony as to his or her reasonable belief are required to meet the objective standard, the court concluded that "fulfilling the second prong requires something more" than a defendant's stated belief. 163 F.3d at 1227. "Because the second prong of the test cannot rest merely on the defendant's own, uncorroborated assertions, its application necessarily involves an exercise of discretion." 163 F.3d at 1228. The Tenth Circuit suggested the following standard for exercising such discretion:

"Just as evaluating whether an error is harmless requires this court to assess the effects of the error in light of the record as a whole [citations omitted], applying the second prong of the Kansas self-defense test involves evaluating the evidence presented by the defendant in light of the totality of the circumstances and making an assessment about the reasonableness of the defendant's belief that self-defense was necessary." 163 F.3d at 1228.

The above rationale, although only persuasive authority, fits well into the Kansas self-defense law. The trial court in the present case, though not specifically employing such a standard, seemed to take the totality of the circumstances into account in deciding that there was no evidence to demonstrate a reasonable person would believe he or she needed, under the circumstances, to act as defendant did.

Defendant on appeal cites *State v. Hunter*, 241 Kan. 629, 740 P.2d 559 (1987), in support of its argument that the evidence presented supports the idea that a reasonable person in defendant's position would have perceived the necessity of self-defense. The *Hunter* court held that it was reversible error to refuse to give an instruction on the defense of compulsion, finding that such a refusal denied the jury an opportunity to consider evidence that "Hunter was afraid for his life, if such fear was reasonable, and if such fear justified any criminal acts which Hunter may have performed." 241 Kan. at 646.

The instant case may be distinguished from *Hunter* by its facts. In *Hunter*, evidence was admitted showing that a man named Remeta was armed, repeatedly talked about murders he had committed or wished he had committed, and at one point actually fired in the direction of Hunter, arguably establishing a reasonable fear for his life. Additional evidence was admitted that Hunter felt he had no chance to escape the situation, as well as evidence that he might not in fact have had a chance to escape. 241 Kan. at 644-45.

In the instant case, no evidence was admitted that a reasonable person would have been unable to free himself or herself from a potentially life-threatening situation without the use of force. To the contrary, the evidence indicated that defendant had every opportunity to escape, rather than to continue walking toward and shooting at what defendant allegedly believed to be the source of life-threatening danger. At the very least, defendant has not specifically pointed out any evidence in the record that would indicate he had no choice between safely fleeing or shooting the passengers of the car. Given that the trial court may refuse to give an instruction if there is no evidence to support the instruction, the trial court correctly concluded that the second prong of the self-defense test had not been met.

### (5) Use of Defendant's Prior Conviction for Sentencing Purposes Without a Jury Determination of the Conviction

Defendant was sentenced to 776 months in prison on the attempted murder conviction. This was the mid-range sentence for a severity level 1 offense with a criminal history score of A at the

time the crime was committed. K.S.A. 1997 Supp. 21-4704. Defendant's criminal history was not submitted to a jury to be proven beyond a reasonable doubt. If defendant had no criminal history (*i.e.*, had a criminal history score of I), the mid-range guidelines sentence would have been 194 months. See K.S.A. 1997 Supp. 21-4704.

Defendant on appeal argues that the United States Supreme Court suggested in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), that all facts, *including* prior convictions, that increase the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. Such a requirement would contradict the Court's holding in *Almendarez-Torres v. United States*, 523 U.S. 224, 140 L. Ed. 2d 350, 118 S. Ct. 1219 (1998) (holding that defendant's prior aggravated felony convictions need not be proven beyond a reasonable doubt, even though the convictions increased defendant's sentence beyond the statutory maximum). The Kansas Sentencing Guidelines Act (KSGA) (K.S.A. 21-4701 *et seq.*) would thus be unconstitutional under the Sixth Amendment right to a jury trial and the Fourteenth Amendment's guarantee of due process.

The issue of the KSGA's unconstitutionality was neither raised at trial nor at the sentencing hearing.

"As a general rule, an issue not presented to the lower court will not be considered on appeal. [Citation omitted.]

" '. . . [W]hen constitutional grounds are asserted for the first time on appeal, they are not properly before [this court] for review.' However, this court has recognized three exceptions to the general rule: (1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the district court is right for the wrong reason. [Citation omitted.]" *State v. Williams*, 275 Kan. 284, 288-89, 64 P.3d 353 (2003).

In *State v. Conley*, 270 Kan. 18, 30-31, 11 P.3d 1147 (2000), *cert. denied* 523 U.S. 932 (2001), this court held that the first two above exceptions applied to a constitutional challenge under *Apprendi* to the State's "Hard 40" sentence which was not raised

below. While the first exception may not apply in the instant case (it is unlikely to be determinative of the case as it only involves the attempted murder charge), defendant's challenge here does involve the potential denial of fundamental constitutional guarantees, specifically, the right to jury trial, and is thus properly before the court.

More damaging to defendant's argument is the acknowledged fact that the issue raised in the instant case has been previously ruled upon in *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002). Defendant asks that this court's holding in *Ivory* be reconsidered.

The essence of defendant's argument is that *Almendarez-Torres* exempted criminal history from the list of sentence-enhancing factors that must be proved beyond a reasonable doubt to a jury, but that case was wrongly decided. The defendant here argues that the *Apprendi* majority implied that "it is arguable that *Almendarez-Torres* was incorrectly decided, and that a logical application of our reasoning . . . should apply if the recidivist issue were contested." 530 U.S. at 489-90.

The arguments made here by defendant are indistinguishable from those made by Ivory. The *Ivory* court found that *Apprendi* does not apply where the sentence imposed was based in part on the defendant's criminal history score under the KSGA:

"The KSGA builds criminal history into the calculation of a presumptive sentence, rather than using criminal history as an enhancement. The determination of a felony sentence is based on two factors: the current crime of conviction and the offender's prior criminal history. The sentence contained in the grid box at the juncture of the severity level of the crime of conviction and the offender's criminal history category is the presumed sentence. [Citations omitted.]" 273 Kan. at 46.

"In *Apprendi*, the United States Supreme Court said: '*Other than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.' (Emphasis added.) 530 U.S. at 490. The prior conviction exception was derived from the holding 2 years earlier in *Almendarez-Torres v. United States*, 523 U.S. 224, 140 L. Ed. 2d 350, 118 S. Ct. 1219 (1998). There, the court concluded that the fact of a prior conviction is a sentencing factor and not an element of the crime. Thus, the prior conviction need not be presented in the indictment and proven to a jury in order to be used by the court to increase the sentence imposed. 523 U.S. at 226-27." 273 Kan. at 46.

As does defendant in the present case, Ivory argued that *Apprendi* raised serious doubts about the constitutionality of *Almendarez-Torres*, and the *Ivory* court cited several cases from other jurisdictions which held that *Apprendi* did not overrule *Almendarez-Torres*. Relevant to this case, the *Ivory* court cited the following from *United States v. Pacheco-Zepeda*, 234 F.3d 411, 414-15 (9th Cir. 2001):

" 'Although *Apprendi* does refer to the fact that the defendant in *Almendarez-Torres* did not challenge the accuracy of his prior convictions, nowhere does *Apprendi* limit *Almendarez-Torres* to cases where a defendant admits prior aggravated felony convictions on the record. [Citation omitted.] To the contrary, *Apprendi* held that *all* prior convictions—*not just those admitted on the record*—were exempt from *Apprendi's* general rule and, under *Almendarez-Torres*, may continue to be treated as sentencing factors.' [Citation omitted.]" (Emphasis added.) *Ivory*, 273 Kan. at 46-47.

As defendant does not provide any additional reasons for the court to reconsider the *Ivory* analysis, reconsideration would not be appropriate based on the above analysis.

Although not cited by either party, recent rulings by the United States Supreme Court on sentencing guidelines issues reaffirm the continuing validity of the prior crimes exception.

In *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004), the United States Supreme Court held that the state trial court's sentencing of the defendant to more than the statutory maximum of the standard range for his offense, on the basis of the sentencing judge's finding that defendant acted with deliberate cruelty, violated his Sixth Amendment right to a trial by jury. In so finding, the majority identified its analysis as an application of the *Apprendi* rule, " '[o]ther than the fact of a prior conviction,' " and concluded that the " 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." 542 U.S. at 301, 303.

In *United States v. Booker*, 543 U.S. 220, 160 L. Ed. 2d 621, 125 S. Ct. 738 (2005), the Court applied the principles of *Apprendi* and *Blakely* to the mandatory provisions of the federal sentencing guidelines and found them unconstitutional as far as they require

judges to find facts by a preponderance of the evidence for the imposition of aggravated sentences. While remedying the unconstitutional provisions by severing those provisions of the statute making application of the guidelines mandatory, the Court specifically reaffirmed its holding in *Apprendi*: "Any fact *(other than a prior conviction)* which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." (Emphasis added.) 543 U.S. at 244.

In *Shepard v. United States*, 544 U.S. 13, 16, 161 L. Ed. 2d 205, 125 S. Ct. 1254 (2005), the Supreme Court held that a trial court may not look to police reports or complaint applications of a prior plea to determine if the prior conviction constituted a violent felony so as to be used to enhance a sentence under the Armed Career Criminal Act, 18 U.S.C. § 924(e) (2000), but it may examine the statutory definition, charging document, written plea agreement, transcript of the plea colloquy, and any explicit factual finding by the trial judge to which defendant assented. The Court reasoned in part that while the disputed fact may be described as a fact about a prior conviction, "it is too far removed from the conclusive significance of a prior judicial record, and too much like the findings subject to *Jones* and *Apprendi*, to say that *Almendarez-Torres* clearly authorizes a judge to resolve the dispute." 544 U.S. at 25.

In a concurring opinion, Justice Thomas opined: "*Almendarez-Torres*, like *Taylor*, has been eroded by this Court's subsequent Sixth Amendment jurisprudence, and a majority of the Court now recognizes that *Almendarez-Torres* was wrongly decided. [Citations omitted.] The parties do not request it here, but in an appropriate case, this Court should consider *Almendarez-Torres'* continuing viability." 544 U.S. at 27-28 (Thomas, J., concurring).

Since *Blakely, Booker,* and *Shepard* were decided, the Tenth Circuit has repeatedly rejected arguments such as those raised by defendant in this case questioning whether a prior conviction may continue to be a judicially recognized fact under *Almendarez-Torres*. See *United States v. Williams*, 403 F.3d 1188, 1198 (10th Cir. 2005) (for purposes of sentencing under the Armed Career Crim-

inal Act, the government need not charge the fact of a prior conviction in an indictment and submit it to a jury after *Booker, Blakely,* and *Shepard*); *United States v. Gonzalez-Huerta,* 403 F.3d 727 n.1 (10th Cir. 2005) ("[T]he holding in *Booker,* envisions *Almendarez-Torres* as good law. . . . We believe that any reconsideration of *Almendarez-Torres* must be conducted by the Supreme Court."); *United States v. Moore,* 401 F.3d 1220, 1224 (10th Cir. 2005) ("Although the Court may overrule *Almendarez-Torres* at some point in the future, it has not done so, we will not presume to do so for the Court, and we are bound by existing precedent to hold that the *Almendarez-Torres* exception to the rule announced in *Apprendi* and extended to the Guidelines in *Booker* remains good law."); see also *United States v. Aguirre-Leon,* 2005 WL 806700, at *3 n.1 (D. Kan. April 7, 2005) (applying *Moore* in holding *Almendarez-Torres* remains good law after *Booker*).

In essence, even if defendant cited factual circumstances sufficient to distinguish his situation from that of the defendant in *Ivory* (which he does not), given that the United States Supreme Court has reaffirmed the *Almendarez-Torres* exception three times in the last year, and given that United States Circuit Courts are reluctant to disturb this rule despite some disapproving language in concurring opinions, *Ivory*'s holding remains good law. The defendant's challenge fails.

## (6) Cumulative Error

"This court looks at the totality of the circumstances to determine whether cumulative errors have substantially prejudiced a defendant and denied his or her right to a fair trial. However, if the evidence is overwhelmingly against the defendant, no prejudicial error may be found on the cumulative effect rule. [Citation omitted.]" *State v. Harris,* 279 Kan. 163, 176-77, 105 P.3d 1258 (2005).

Defendant argues on appeal that the trial court erred in deciding all of the issues described above, and that these errors constitute reversible cumulative error.

The evidence of defendant's guilt can only be described as overwhelming: a videotaped confession in which defendant describes in great detail how he shot at two people in a car, killing one, with nearly every detail corroborated by a law enforcement official or

other independent witness. Defense counsel at trial conceded as much, arguing that a theory of self-defense was the only way he could defend the case. In light of this evidence, no prejudicial error may be found on the cumulative effect rule in the present case.

Affirmed.

LOCKETT, J., Retired, assigned.